**UNITED STATES of America**

v.

**John J. RIGAS and Timothy J. Rigas.**

No. 4:05–CR–402.

United States District Court,
M.D. Pennsylvania.

July 11, 2008.

Benard V. Preziosi, Jr., Curtis Mallet Prevost, Jeremy H. Temkin, Morvillo Abramowitz, New York, NY, for Defendants.

George J. Rocktashel, U.S. Attorney's Office, Williamsport, PA, for Plaintiff.

## MEMORANDUM AND ORDER

JOHN E. JONES III, District Judge.

This matter is before the Court on the defendants' Motion to Dismiss the Indictment on Double Jeopardy and Collateral Estoppel Grounds. (Doc. 57.) Defendants John J. Rigas and Timothy J. Rigas (collectively "the Rigases"), argue that the conspiracy with which they are charged in this action is the same offense as the conspiracy charge prosecuted in a prior action in the United States District Court for the Southern District of New York, and therefore, the current prosecution is barred by the Fifth Amendment's protection against double jeopardy. The defendants also argue that, in the prior New York action, they were acquitted of the conduct which underlies the tax evasion counts charged in this action, and therefore, that these charges are barred by the principle of collateral estoppel. For the reasons set forth below, the defendants' motion will be denied.

## I. BACKGROUND

### A. The New York Action

On September 23, 2002, a grand jury sitting in the Southern District of New

York returned a twenty-four count ·indictment against the Rigases, along with Michael Rigas, Michael Mulcahey, and James Brown. *See United States v. Rigas, et al.,* No. S1 02 CR 1236 (S.D.N.Y.) (the "New York action"). A superceding indictment was returned on July 30, 2003, charging the Rigases, Michael Rigas, and Michael Mulcahey with: (i) one count of conspiracy to commit securities fraud, wire fraud, and bank fraud, to make false statements in SEC filings, and to make false books and records in violation of 18 U.S.C. § 371; (ii) fifteen counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; (iii) five counts of wire fraud in violation of 18 U.S.C. §§ 2, 1343, and 1346; and (iv) two counts of bank fraud in violation of 18 U.S.C. §§ 2 and 1344.[1] (Doc. 58, Ex. B [the "New York Indictment"].) The indictment was supplemented by a bill of particulars on January 2, 2004. (Doc. 58, Ex. C.)

The New York charges arose from the precipitous decline of Adelphia Communications Corporation ("Adelphia").[2] From its humble beginnings in 1952 in the town of Coudersport, Pennsylvania, Adelphia grew to become, as of December 31, 2000, the sixth largest cable television provider in the United States. By June 25, 2002, however, Adelphia had filed for bankruptcy, and its impressive growth over many decades was eclipsed by a spectacular public flameout.

The Rigases are the central figures in the rise and fall of Adelphia. John Rigas built the company, and with his sons Michael and Timothy, took Adelphia public in 1986. The Rigas family, however, retained most of the voting shares and control of the company. Until their resignations in May 2002, John Rigas served as Chairman of the Board of Directors, President, and CEO; Timothy Rigas was a Board member, Executive Vice President, and CFO; and Michael Rigas was a Board member and Executive Vice President of Operations. Michael Mulcahey was Director of Internal Reporting, and reported to Timothy Rigas.

Adelphia was organized as a holding company, indirectly owning the assets of its subsidiaries. Separate from, but connected with, Adelphia and its subsidiaries were certain "Rigas family entities" or "RFEs." These cable companies and other businesses were privately owned by Rigas family members, but managed, in part, by Adelphia, and the operating revenues and expenses of the RFEs and Adelphia and its subsidiaries were organized through a centralized cash management system.

Beginning in the late 1990s, Adelphia embarked on an ambitious, costly, and ultimately disastrous plan to upgrade its cable systems and acquire other cable operators. To raise the billions of dollars needed to finance these rebuild and acquisition plans, Adelphia and its subsidiaries secured loans from banks and issued debt and equity securities to the public. Certain of the loans were obtained through "co-borrowing" arrangements, whereby the RFEs and Adelphia subsidiaries were jointly and severally liable for the loans. Adelphia

---

1. James Brown pled guilty to counts 1, 2, and 23 of the indictment on November 14, 2002.

2. In addition to the substantial record provided by the parties, the Court's recitation of the background of this case is aided by the comprehensive opinions of the United States Court of Appeals for the Second Circuit and the United States District Court for the South-

ern District ·of New York, the accuracy of which no party questions. *See, e.g., United States v. Rigas,* 490 F.3d 208, 213–19 (2d Cir.2007), *cert. denied* —— U.S. ——, 128 S.Ct. 1471, 170 L.Ed.2d 296 (2008); *United States v. Rigas,* 258 F.Supp.2d 299, 301–03 (S.D.N.Y.2003).

suffered negative cash flow as its expenditures on the rebuild and acquisition plans rose, and the company became highly leveraged as the concomitant debt mounted.

The New York indictment charged that, from 1999 to May 2002, the defendants engaged in a scheme designed to defraud Adelphia's shareholders and creditors by concealing the company's increasingly precarious financial condition and the Rigas family's improper use of Adelphia funds for personal purposes. The indictment focused on five areas.

First, the government alleged that the defendants caused Adelphia to issue financial filings, press releases, and statements to investors and analysts which misrepresented that Adelphia was substantially reducing its debt, in large part through the Rigas family's purchase of Adelphia stock. See Rigas, 490 F.3d at 213–15; New York Indictment at ¶¶ 73–91. To maintain control over the company, the Rigases persuaded the Adelphia board to sell them stock each time the company issued new shares to generate capital. The stock purchase agreements required the Rigases to pay for the shares immediately in cash, and Adelphia's public filings and press releases suggested that they did so. The Rigases, however, did not have enough cash to deleverage Adelphia in this manner. Instead, the Rigases borrowed the funds to purchase the shares, but then caused Adelphia to use the borrowed funds to pay off other family debts. Later, in lieu of paying cash, the Rigases "assumed" Adelphia debt by causing Adelphia to "reclassify" some of the debt it owed under the co-borrowing agreements by "moving" it from Adelphia's books to one of the RFEs'. The Rigases's "assumption" of this debt was illusory: under the co-borrowing agreements, Adelphia was still jointly and severally liable for the debt. Had the

Rigases paid for the shares in cash, as they represented to analysts and investors, Adelphia would have been able to pay down its debt. Instead, the Rigases retained control of the company by obtaining more stock with more borrowed money while Adelphia received no new cash and remained liable for the debt under the co-borrowing agreements.

Second, the government alleged that the defendants concealed Adelphia's liability under the co-borrowing agreements. See Rigas, 490 F.3d at 215; New York Indictment at ¶¶ 64–72. The defendants caused Adelphia to issue financial statements which masked the amount that the RFEs owed to Adelphia by reporting all liabilities of the RFEs as one "netted" related party receivable. When even this number became too large, the amount was further concealed by moving debt from Adelphia's books to the books of an RFE. The amount the RFE owed Adelphia would then be credited by this "assumption." This arrangement provided no benefit to Adelphia, but allowed the defendants to avoid disclosing the high net receivable balance from the RFEs.

Third, the government alleged that the defendants misrepresented Adelphia's operating performance in three major ways. See Rigas, 490 F.3d at 215–17; New York Indictment at ¶¶ 92–158. First, Adelphia, primarily at the direction of Timothy Rigas, distributed quarterly earnings press releases and other information which fraudulently reported growth in Adelphia's cable subscribers by including subscribers of other companies, home security subscribers, and highspeed internet subscribers who had not yet begun receiving or paying for Adelphia service. Second, at "road shows" and conference with investors, shareholders' meetings, and in information provided to Adelphia lenders, Timothy Rigas fraudulently overstated the

percentage of Adelphia's cable systems that had been upgraded to provide digital cable and high speed internet access. These technology upgrades were critical to Adelphia's long-term outlook, and cost the company between $1.5 and $2 billion annually. Finally, at the direction of Timothy Rigas and with the knowledge and acquiescence of John Rigas, Adelphia manipulated its earnings before interest, taxes, depreciation, and amortization ("EBITDA"), a measure commonly used by investors to assess a company's earnings from operations. Adelphia fraudulently inflated the management fees that the RFEs owed the company and then recorded a corresponding interest expense that Adelphia owed to the RFE. The RFE thus did not actually pay Adelphia a larger net fee, but because the amount Adelphia owed the RFE was classified as interest, it was not included in EBITDA. Adelphia also engaged in "wash transactions" with equipment suppliers whereby it would pay an increased price for equipment, and the suppliers would pay Adelphia an amount equal to the increase purportedly in exchange for advertising and market support. Because the increased payments to suppliers were capital expenses and the amounts received from the suppliers were classified as revenue, Adelphia's EBITDA increased. Adelphia never provided any advertising or market support for the suppliers. As a result of its fraudulently increased EBITDA, Adelphia was able to appease investors, remain in compliance with bond covenants, and obtain lower interest rates on loans from banks.

Fourth, the government alleged that the defendants caused Adelphia to misrepresent its compliance with the terms of its bank loans. See Rigas, 490 F.3d at 217–18; New York Indictment at ¶¶ 159–166. The co-borrowing agreements required minimum ratios of cash flow to indebtedness, and tied lower interest rates to this ratio. By manipulating its EBITDA, Adelphia was able to artificially inflate this ratio and obtain lower interest rates. In addition, when the EBITDA of a particular group of RFEs and Adelphia entities that had entered into a co-borrowing agreement became too low, the defendants would move expenses and income between Adelphia entities to maintain a high EBITDA and thus lower interest rates.

Finally, the government alleged that the Rigases took over $200 million of Adelphia money for personal expenses without proper disclosure. See Rigas, 490 F.3d at 218; New York Indictment at ¶¶ 167–97. From 1999 to April 2002, Adelphia advanced millions of dollars to the Rigases in excess of their publicly disclosed compensation. These funds were either transferred directly to the Rigases or first to an RFE and then onto a Rigas family member. Payments of Adelphia money to John Rigas became so large that in early 2001, Timothy Rigas instructed that disbursements to his father should be limited to $1 million per month. The defendants also caused Adelphia to pay for margin calls made on loans that Rigases family members had secured by pledging Adelphia stock as collateral. The Rigases had used the proceeds of these loans to purchase Adelphia stock and maintain control of the company. Adelphia also paid for the Rigas family's use of its corporate aircraft and the construction of a golf course on land owned by John Rigas. These payments to the Rigases were not reported by Adelphia as compensation or loans, or disclosed to investors as related party transactions.

After a four-and-a-half month trial, on July 8, 2004, the jury found John Rigas and Timothy Rigas guilty of: (i) conspiracy to commit securities fraud, make false statements in SEC filings, false books and records, and bank fraud; (ii) securities

fraud; and (iii) bank fraud. (Doc. 58, Ex. E, New York Special Verdict.) John Rigas and Timothy Rigas were acquitted of conspiracy to commit wire fraud and wire fraud. Michael Rigas was acquitted of the conspiracy and wire fraud charges, and the jury was undecided as to the other counts. Michael Mulcahey was acquitted of all charges.

## B. The Current Indictment

On October 6, 2005, a grand jury returned an indictment in this Court charging John Rigas and Timothy Rigas with: (i) one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and (ii) six counts of tax evasion in violation of 26 U.S.C. § 7201. (Doc. 1.) The indictment charges that, from 1989 to the date of the indictment, using a complex network of family-owned entities, the Rigases obtained approximately $1.9 billion in Adelphia funds for their personal use, and by failing to report this money as income, defrauded the Internal Revenue Service of more than $300 million in taxes. The indictment further asserts that, to conceal the diversion of the funds from Adelphia's auditors and the accountants that prepared their tax returns, the Rigases prepared bogus loan documents and accounting entries which treated the diverted Adelphia funds as inter-company receivables. The Rigases, however, did not intend to repay the money, and in fact never did so.

Count one of the indictment alleges numerous overt acts that the Rigases took in furtherance of their conspiracy to defraud the IRS, including:

- In 1988, Timothy Rigas began characterizing payments to the Rigases as "inter-company transfers" on Adelphia's books to make the payments look like loans or inter-company receivables, and thus avoid paying income tax on the funds.

- Beginning in 1989 and thereafter, Timothy Rigas caused Adelphia employees to make false and fraudulent accounting entries which showed the transfer of Adelphia debt to RFEs and the repayment of that debt by the RFEs, when in fact Adelphia repaid the debt with corporate funds.

- Between 1996 and 2002, the Rigases caused Adelphia to transfer $3.053 billion of funds borrowed from banks to RFEs. The Rigases misrepresented to the accountants preparing their tax returns that they were personally liable for the funds transferred from Adelphia to the RFEs.

- On several occasions between 1997 and 2002, John Rigas signed notes purportedly documenting loans from Adelphia to RFEs, but the "loans" were not repaid and John Rigas personally received cash advances from Adelphia over this time.

- From 1998 to 2002, John Rigas received tens of millions of dollars from Adelphia routed through an RFE known as Highland Holdings. Neither John Rigas nor Highland Holdings repaid these funds.

- From 1998 to 2002, Timothy Rigas arranged for Adelphia employees to disburse $1 million per month to the personal account of John Rigas through Highland Holdings, but did not place any of these funds on Adelphia's books.

- From 1997 to 2002, John and Timothy Rigas diverted Adelphia funds to pay personal expenses, including credit card bills, real estate development, charitable contributions, use of corporate aircraft and apartments, and the purchase of antique furniture.

- From 1989 to 2002, John and Timothy Rigas caused Adelphia to transfer funds to RFEs to pay for purchases of Adelphia stock and to cover margin loans from banks used to buy Adelphia stock.
- In March 1994, John Rigas purportedly transferred real estate worth $14 million to Adelphia to cover some of the disbursements of Adelphia funds for personal use, but in fact never legally transferred $10 million worth of the properties and retained control over them.

(*Id.* at 6–10.)

Counts two through seven charge that John Rigas and Timothy Rigas each evaded federal income tax for the years 1998, 1999, and 2000 by vastly under-reporting their personal income to the IRS.

## II. DISCUSSION

In the present motion, the defendants raise two grounds for dismissal of the indictment: that the conspiracy with which they are charged in this action is the same as the conspiracy offense for which they were prosecuted in the New York action and therefore is barred by the Fifth Amendment's protection against double jeopardy, and that their acquittal on the wire fraud charges in the New York action bars the tax evasion charges in this action under the *doctrine of collateral estoppel.* Each argument is addressed in turn.

### A. Double Jeopardy

■ The defendants' first argument is that the conspiracy with which they are charged in this action is the same offense as the conspiracy prosecuted in the New York action, and therefore, that the current prosecution is barred by the protection against double jeopardy. The burden is on a criminal defendant to put his double jeopardy claim at issue by making a non-frivolous showing of double jeopardy. *United States v. Garcia*, 919 F.2d 881, 886–87 (3d Cir.1990). Once the defendant makes this prima facie showing, the burden of persuasion shifts to the government to prove by a preponderance of the evidence that the indictments or punishments at issue are not for the same offense. *Id.*

The parties disagree, however, as to what must be proven to demonstrate that two successively prosecuted conspiracies are the "same offence" for purposes of the Fifth Amendment's protection against double jeopardy. This disagreement is not surprising. Jurisprudence governing the Double Jeopardy Clause, especially as applied to conspiracies, has been plagued by a cacophony of terms, *Grady v. Corbin*, 495 U.S. 508, 521 n. 12, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) ("Terminology in the double jeopardy area has been confused at best."), back-and-forth precedent, *see, e.g., United States v. Dixon*, 509 U.S. 688, 704, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (overruling *Grady* ), and resort to unhelpful geometric metaphor, *see United States v. Perez*, 489 F.2d 51, 59 n. 11 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 3068, 41 L.Ed.2d 664 (1974) ("[T]he problem is difficult enough without trying to compress it into figurative analogies. Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains, or any one or all of today's galaxy of mechanical molecular or atomic forms."). Under either of the potentially applicable standards, however, the conspiracy for which the Rigases were prosecuted in the New York action and the conspiracy charged in the indictment in this case are not the same offense, and therefore, the defendants' motion to dismiss the indictment on double jeopardy grounds will be denied.

■ The Fifth Amendment provides, in relevant part, that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., Amend. V. This protection against double jeopardy bars both successive punishments and successive prosecutions for the same criminal offense. *Dixon,* 509 U.S. at 696, 113 S.Ct. 2849 (citing *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)). The Supreme Court has held that in both the multiple punishment and multiple prosecution contexts, the "same-elements" test is used to determine whether the two charges for which the defendant is punished or tried are the "same offense" for purposes of the Double Jeopardy Clause. *Id.* The "same-elements" test is also referred to as the *"Blockburger* test", after *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the case from which the test is derived. The same-elements test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Dixon,* 509 U.S. at 696, 113 S.Ct. 2849. As stated in *Blockburger* itself:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.... A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

284 U.S. at 304, 52 S.Ct. 180 (citations omitted).

The Supreme Court applied the *Blockburger* test to multiple conspiracy charges in *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). In that case, the defendants were involved in a scheme to import marijuana and then to distribute it domestically. The defendants were convicted of conspiracy to distribute marijuana under 21 U.S.C. § 846 and conspiracy to import marijuana under 21 U.S.C. § 963. They received consecutive sentences on each charge, the combined length of which exceeded the maximum sentence for either charge individually. The defendants argued that the case involved only a single conspiracy, and therefore, multiple punishments under both statutes were prohibited by the Double Jeopardy Clause. The Supreme Court disagreed. The Court described the *Blockburger* test as a "rule of statutory construction ... to be used to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively." *Id.* at 337, 101 S.Ct. 1137 (quoting *Whalen v. United States,* 445 U.S. 684, 691, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)). Applying *Blockburger,* the Court found that "[s]ections 846 and 963 specify different ends as the proscribed object of the conspiracy—distribution as opposed to importation—and it is beyond peradventure that each provision requires proof of a fact that the other does not." *Id.* at 339, 101 S.Ct. 1137 (internal punctuation omitted). The Court therefore found that the multiple punishments imposed on the defendants did not violate the Double Jeopardy Clause.

In so holding, the Court distinguished its opinion in *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). In *Braverman,* the defendants were charged with seven counts of conspiracy in violation of 18 U.S.C. § 88 (1909), the predecessor statute to the current 18

U.S.C. § 371.[3] Each count charged a conspiracy to commit a different offense under the Internal Revenue Code, all arising out of a moonshining operation. Although the indictment charged seven conspiracies, at trial, the government conceded that the charges arose from a single agreement to violate seven different statutes. The defendants were found guilty of all counts and received consecutive sentences. On appeal, the Supreme Court reversed the consecutive sentences, stating that "[t]he one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." *Braverman*, 317 U.S. at 53, 63 S.Ct. 99. Based on the government's concession that only one agreement was at issue, the Court held that the consecutive sentences imposed were impermissible.

The *Braverman* court, however, expressly limited its holding to the situation where defendants reach a single agreement to commit multiple crimes. The Court stated that the "single continuing agreement" in that case "differs from successive acts which violate a single penal statute and from a single act which violates two statutes." *Id.* at 54, 63 S.Ct. 99 (citing *Blockburger*, 284 U.S. at 301–04, 52 S.Ct. 180). The *Albernaz* court distinguished *Braverman* on this basis. Unlike the conspiracy in *Braverman*, which had many objectives but violated only a single statutory provision, the conspiracy in *Albernaz* violated two distinct statutory provisions. *Albernaz*, 450 U.S. at 339–40, 101 S.Ct. 1137; *see also id.* (relying on *American Tobacco Co. v. United States*, 328 U.S.

781, 788, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) which upheld convictions for conspiracy in restraint of trade in violation of § 1 of the Sherman Act and conspiracy to monopolize in violation of § 2 of the Sherman Act, which arose from cigarette price fixing).In this case, the government argues that the *Blockburger* test determines whether the conspiracy counts of the New York and Pennsylvania indictments violate the Double Jeopardy Clause because these two counts are charged under two different statutory provisions: the conspiracy to commit an offense clause of § 371 and the conspiracy to defraud the United States clause of § 371. The government concludes that, as in *Albernaz*, the two prosecutions under these separate statutory provisions do not subject the defendants to double jeopardy.

■ The Rigases argue that a different test controls their double jeopardy claim because this case involves successive conspiracy prosecutions. The Third Circuit has stated that "[a]lthough the 'same evidence' test is normally used to ascertain whether successive prosecutions charge the same crime, in *[United States v.] Liotard* [,817 F.2d 1074, 1078 (3d Cir.1987),] we recognized that multiple conspiracy indictments raised special concerns that the 'same evidence test' might not adequately address. The danger is that successive indictments against a single defendant for participation in a single conspiracy might withstand same evidence scrutiny if the court places undue emphasis upon the evidence used to prove the commission of the overt acts alleged."[4] *United States v.*

---

**3.** The former 18 U.S.C. § 88 provided: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

**4.** The term "same evidence test" here means the *Blockburger* or same elements test. *See, e.g., United States v. Becker*, 892 F.2d 265, 268

*Smith*, 82 F.3d 1261, 1266–67 (3d Cir. 1996). To address this concern, the Third Circuit in *Liotard* followed several other courts of appeals in adopting a "totality of the circumstances" test which is intended to de-emphasize overt acts and focus on the alleged agreement between the co-conspirators, which constitutes the crime of conspiracy. *Smith*, 82 F.3d at 1267 (citing *Liotard*, 817 F.2d at 1078). Four factors are considered under the totality of the circumstances: (a) the "locus criminis" of the alleged conspiracies; (b) the degree of temporal overlap between the conspiracies; (c) the overlap of personnel between the conspiracies, including unindicted co-conspirators; and (d) the similarity in the overt acts charged and role played by the defendant in each indictment. *Id.* The ultimate question remains, however, whether there are multiple agreements or only one. *Id.*

▮ In this case, the *Blockburger* test controls the defendants' double jeopardy claim because the two charges at issue arise under distinct statutory provisions, and because rote application of the *Liotard* test would lead to a superficial focus on the evidence used to prove the charges, the very danger which that case sought to avoid.

As in *Albernaz*, the conspiracies prosecuted in the New York action and in this case are charged under distinct statutory provisions that proscribe different conspiracies. The general conspiracy statute provides in relevant part:

> If two or more persons conspire *either* to commit any offense against the United States, *or* to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371 (emphasis added). On its face then, § 371 contains "two distinct statutory provisions", *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180, which "specify different ends as the proscribed object of the conspiracy", *Albernaz*, 450 U.S. at 339–40, 101 S.Ct. 1137. The "offense" clause of § 371 makes it a crime to conspire with the object of committing a substantive offense proscribed by another statute. The "defraud" clause of § 371 makes it a crime to conspire to defraud the United States. The New York indictment charged the Rigases, under the *offense* clause, with conspiracy to commit securities fraud, wire fraud, and bank fraud, to make false statements in SEC filings, and to falsify books and records. By contrast, in the indictment in this action, the Rigases are charged, under the *defraud* clause, with conspiracy to defraud the United States by impeding the IRS in the collection of income taxes.[5]

---

(3d Cir.1989) (citing *Blockburger* as authority for the "same evidence test"). As the Supreme Court has explained: "Terminology in the double jeopardy area has been confused at best. Commentators and judges alike have referred to the *Blockburger* test as a 'same evidence' test. This is a misnomer. The *Blockburger* test has nothing to do with the evidence presented at trial. It is concerned solely with the statutory elements of the offenses charged." *Grady*, 495 U.S. at 521 n. 12, 110 S.Ct. 2084 (citations omitted).

**5.** The conspiracy with which the Rigases are charged in this action is frequently referred to as a *"Klein* conspiracy." The term is derived from *United States v. Klein*, 247 F.2d 908 (2d Cir.1957), and generally refers to a conspiracy to frustrate the government, particularly the IRS, in its lawful information gathering functions. *Alston*, 77 F.3d at 717 n. 13. The fact a conspiracy under the defraud clause of § 371 is regularly referred to by a term that does not encompass an offense clause conspiracy is further evidence that the statute creates two separate and distinct offenses.

■ The parties have not identified, and the Court's independent efforts have not uncovered, any controlling precedent directly addressing the question of whether the "offense" clause and the "defraud" clause of § 371 are different offenses for purposes of double jeopardy. In other contexts, however, the Third Circuit has acknowledged that § 371 criminalizes two distinct types of conspiracies. *United States v. Alston,* 77 F.3d 713, 718 (3d Cir.1995); *United States v. Vazquez,* 319 F.2d 381, 384 (3d Cir.1963). Notably, the Third Circuit has also developed separate and distinct model jury instructions for "offense" clause charges and "defraud" clause charges. *See* Third Circuit Model Criminal Jury Instructions 6.18.371A & Cmt. and 6.18.371B, available at http://www.ca3.uscourts.gov/criminaljury/tocand instructions.htm.

The majority of other federal courts of appeals directly addressing the issue at hand have found that § 371 establishes two offenses and that prosecution or punishment under both clauses does not violate the Double Jeopardy Clause. In *United States v. Ervasti,* 201 F.3d 1029, 1039–40 (8th Cir.2000), the court concluded that "[t]hough it is not divided formally

into subsections, § 371 plainly establishes two offenses," and applied the *Blockburger* test in rejecting the defendant's double jeopardy challenge to his convictions under both the offense and defraud clauses. Similarly, in *United States v. Thompson,* 814 F.2d 1472, 1476–77 (10th Cir.), *cert. denied* 484 U.S. 830, 108 S.Ct. 101, 98 L.Ed.2d 61 (1987) the court applied *Blockburger* in rejecting the defendant's double jeopardy challenge to his prosecution for conspiracy to defraud to the United States which occurred after he pled guilty to conspiracy to commit mail fraud. The court in *United States v. Smith,* 424 F.3d 992, 1000 (9th Cir.2005), *cert. denied* 547 U.S. 1008, 126 S.Ct. 1477, 164 L.Ed.2d 257 and 547 U.S. 1073, 126 S.Ct. 1770, 164 L.Ed.2d 522 (2006), however, reached the opposite conclusion, and applied a multi-factor test analogous to *Liotard* in addressing the defendants' double jeopardy challenge to multiple sentences imposed for counts charged under both the offense and defraud clauses. *But see United States v. Tham,* 960 F.2d 1391, 1399–1400 (9th Cir. 1992) (upholding convictions and sentences on separate counts under offense and defraud clauses of § 371).[6]

---

**6.** In other contexts, federal courts have reached somewhat mixed results regarding whether § 371 creates one or two offenses. For example, numerous courts have held that the requirement of *Tanner v. United States,* 483 U.S. 107, 128–32, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), that the prosecution prove the United States or one of its agencies was the target of the conspiracy applies only to the defraud clause and not the offense clause. *See, e.g., United States v. Brandon,* 17 F.3d 409, 422 (1st Cir.1994); *United States v. Falcone,* 960 F.2d 988, 990 (11th Cir.1992); *United States v. Loney,* 959 F.2d 1332, 1338–40 (5th Cir.1992); *United States v. Gibson,* 881 F.2d 318, 320–21 (6th Cir.1989). These cases support the notion that the two clauses of § 371 are distinct provisions that create different offenses. On the other hand, numerous courts have held that it is permissible to

charge violation of both clauses of § 371 in a single indictment count rather than specifying whether the alleged conspiracy was one to defraud or one to commit an offense. *See, e.g., United States v. Hauck,* 980 F.2d 611, 615 (10th Cir.1992); *United States v. Bilzerian,* 926 F.2d 1285, 1301–02 (2d Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Smith,* 891 F.2d 703, 711–13 (9th Cir.1989), *amended by* 906 F.2d 385 (1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *May v. United States,* 175 F.2d 994 (D.C.Cir.), *cert. denied,* 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949). In reaching this decision, some courts have stated that the two clauses of § 371 should be interpreted to establish alternative means of commission, not separate offenses. The better interpretation of § 371 in the duplicity context, however, is that where

The plain text of § 371, the recognition by the Third Circuit that § 371 proscribes two discrete types of conspiracies, and the conclusions of the majority of other courts of appeals to address the issue all persuasively support the conclusion that the two clauses of § 371 are distinct statutory offenses. Because the charges against the Rigases in the New York action and in this case arise under separate statutory provision, the *Blockburger* test, by its own explicit terms, governs their double jeopardy claim. *See Blockburger,* 284 U.S. at 304, 52 S.Ct. 180 ("The applicable rule is that, where the same act or transaction constitutes a violation of *two distinct statutory provisions,* the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

■ Under the *Blockburger* same-elements test, the Rigases's double jeopardy claim must fail. In this action, the Rigases are charged with conspiracy to defraud the United States by impeding the lawful functions of the IRS. The elements of a conspiracy to defraud the United States are: (1) an agreement to defraud the United States; (2) an overt act by one of the conspirators in furtherance of that objective; and (3) any conspirator's commission of at least one overt act in furtherance of the conspiracy. *United States v. McKee,* 506 F.3d 225, 238 (3d Cir.2007) (citing *United States v. Rankin,* 870 F.2d 109, 113 (3d Cir.1989)). "To conspire to defraud the United States means primarily to cheat the government out of property or money, but also means to interfere with or obstruct the government by deceit, craft, trickery, or at least by means that are dishonest." *Id.* (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)).

■ In the New York action, the Rigases were charged with conspiracy to commit securities fraud, wire fraud, and bank fraud, to make false statements in SEC filings, and to falsify books and records. The elements of a conspiracy to violate federal law are: (1) an agreement to commit an offense proscribed by federal law; (2) the defendant's intentionally joining in the agreement; (3) that one of the conspirators committed an overt act; and (4) that the overt act was in furtherance of the conspiracy. *See* O'Malley, *et al.,* Federal Jury Practice And Instructions, Pattern Criminal Jury Instructions, Instruction 62 (1988); Sand, *et al.,* Modern Federal Jury Instructions—Criminal § 19.01, Instruction 19–3 (2006); *see also United States v. Mastrangelo,* 172 F.3d 288, 291 (3d Cir. 1999) (stating to establish a conspiracy, the prosecution must prove (1) a shared unity of purpose, (2) an intent to achieve a common goal, (3) an agreement to work together toward the goal, and (4) the defendant's knowledge of the illegal objective contemplated by the conspiracy); *United States v. Kapp,* 781 F.2d 1008, 1010 (3d Cir.1986) (stating "the essence of criminal conspiracy ... is an agreement, either ex-

conduct violates both the offense and defraud clause, the government has the discretion to charge an offense under either clause or both, in one count or two. *See United States v. Arch Trading Co.,* 987 F.2d 1087, 1092 (4th Cir. 1993) (stating "the fact that a particular course of conduct is chargeable under one clause does not render it immune from prosecution under the other. When both prongs of § 371 apply to the conduct with which a

particular defendant is charged, the government enjoys considerable latitude in deciding how to proceed."). In any event, the cases construing § 371 in the double jeopardy context are, of course, more on point, and the holdings of the majority of these cases, together with admittedly limited Third Circuit precedent in this area, supports a finding that § 371 creates two distinct statutory offenses.

plicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with intent to commit the underlying offense"); *United States v. Uzzolino*, 651 F.2d 207, 214 n. 13 (3d Cir.1981) ("In order to prove a conspiracy under § 371, the Government was only required to prove: (1) the combination of two persons, (2) a real agreement, (3) an unlawful purpose, and (4) an overt act by one of the conspirators"). In order to sustain a conviction on a charge of conspiracy to violate a federal statute under the offense clause of § 371, the government must prove at least the degree of criminal intent necessary for the substantive offense itself. *United States v. Feola*, 420 U.S. 671, 685–86, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

Thus, the offense clause and the defraud clause of § 371 each contain an element not contained in the other, and therefore, are not the same offense. *Dixon*, 509 U.S. at 696, 113 S.Ct. 2849. To prove an offense conspiracy, the prosecution must prove the defendant's intent to commit the substantive offense, but need not show any deceit or dishonesty, *i.e.* fraud, or that the government was the intended target. Conversely, to prove a defraud conspiracy, the prosecution must prove the interference with government functions through fraud, but need not demonstrate that the defendant's conduct was otherwise criminal. *See* Sand, § 19.02 ("The principal difference between the statutory purpose instructions concerning conspiracy 'to defraud the United States' and 'to violate federal law' arises from the omission in [the defraud] provision of section 371 of the requirement that the conspiracy have the object to violate a federal law."). The two clauses of § 371 address two distinct wrongs: the offense clause proscribes concerted action to violate federal law; the defraud clause proscribes concerted action to interfere with the operation of the Unit-

ed States government. As in *Albernaz*, the two statutory provisions at issue here "specify different ends as the proscribed object of the conspiracy" and "each provision requires proof of a fact that the other does not." *Albernaz*, 450 U.S. at 339, 101 S.Ct. 1137. Thus, like in *Albernaz*, the two conspiracy charges at issue in this case are not the same offense, and the current prosecution is not barred by the Double Jeopardy Clause.

The defendants argue that *Albernaz* is inapposite because that case involved consecutive sentences whereas this case involves successive prosecutions. The Supreme Court, however, has made it clear that the *Blockburger* test determines whether two offenses are the same in both the multiple punishment and the multiple prosecution contexts. In *Dixon*, the Court explicitly rejected the notion that the two circumstances could be governed by two different standards, stating: "We have often noted that the [Double Jeopardy] Clause serves the function of preventing both successive punishment and successive prosecution, but there is *no* authority . . . for the proposition that it has different meanings in the two contexts." *Dixon*, 509 U.S. at 704, 113 S.Ct. 2849 (citation omitted; emphasis in original). Whether multiple punishments or successive prosecutions are at issue, *Blockburger* is the standard, and under the *Blockburger* test, the charges against the Rigases here and in New York are not the same offense.

In contrast to *Albernaz* and this case, the *Liotard* decision dealt solely with multiple conspiracies all charged under the offense clause of § 371, rather than charges under separate statutory provisions, and therefore, does not control here. *Liotard*, 817 F.2d at 1076. The same result would be reached, however, by an application of the *Liotard* test that faith-

fully bears in mind the purposes of the holding in that case.

■■■ On the surface, an examination of the *Liotard* factors reveals some similarity between the conspiracy charged in New York and the conspiracy charged in this action. The locus criminis, or the place where the crime was committed, *Smith*, 82 F.3d at 1268, overlaps to some extent as Adelphia was headquartered in Coudersport, Pennsylvania and the Rigases maintained their residence there. The current indictment, however, includes overt acts in other locations, such as real estate development in Colorado, the purchase of the Buffalo Sabres hockey team, use of corporate aircraft based in New York, and use of a corporate apartment in Manhattan. The New York indictment detailed the Rigases misrepresentations to geographically diverse investors and banks through traveling road-shows, widely disseminated press releases and conference calls, and statements in government filings.

With regard to temporal overlap, the charged conspiracies share some of the same timeline, but not complete coincidence. The New York indictment charged a conspiracy between 1999 and May 2002 and focused on overt acts during this time period. The indictment in this case charges a conspiracy from November 1988 to May 2005, and in other counts, charges that the Rigases failed to pay income tax for 1998, 1999, and 2000.

With regard to the degree of overlap of personnel, John Rigas and Timothy Rigas are prominent in both indictments. The New York indictment, however, included several other co-conspirators, Michael Rigas, Michael Mulcahey, and initially James Brown, who are absent from the current indictment.

Finally, there is some overlap between the overt acts charged in both indictments. In the present indictment, the Rigases are alleged to have diverted Adelphia funds for their personal use. Similar allegations of self-dealing by the Rigases are contained in the New York indictment. The bulk of the overt acts from the New York indictment detailing the Rigases's misrepresentations to investors, banks, and analysts, however, are largely not included in the current indictment. Similarly, the Rigases's overt acts to avoid payment of income taxes are included in the present indictment but not the New York indictment.

This rather mechanical application of the *Liotard* factors indicates a degree of overlap and similarity between the conspiracies charged in New York and in this action that, taken alone, may be sufficient to meet the Rigases's burden of making a non-frivolous showing of double jeopardy. The focus of the *Liotard* test, however, is not on these overt acts and other evidence used to prove the conspiracies. In fact, the purpose of the totality of the circumstances test is to place less weight on such evidence to avoid the danger that the government might prosecute a defendant twice for the same conspiracy by emphasizing some overt acts in the first prosecution and others in the second. *Smith*, 82 F.3d at 1266–67; *Liotard*, 817 F.2d at 1078.

The true focus of the *Liotard* test is simply whether there is one agreement or two. As the Third Circuit has explained, "[i]n applying the *Liotard* totality of the circumstances analysis, we have understood that the ultimate inquiry presented by conspiracy double jeopardy claims is whether there are two agreements or only one. To that end, we have not applied the *Liotard* factors in a rigid manner, as different conspiracies may warrant emphasizing different factors." *Smith*, 82 F.3d at 1267; *see also id.* (stating "we must keep in mind that a primary objective of our

jurisprudence in this area is to assure that the substance of the matter controls"); *Becker*, 892 F.2d at 268 ("The critical determination is whether one agreement existed."); *United States v. Young*, 503 F.2d 1072, 1076 (3d Cir.1974) ("It is the agreement which constitutes the crime, not the overt acts.") [7]

The circumstances of this case reveal two agreements. In the New York action, the Rigases were charged with agreeing to conceal from investors, analysts, and lenders the failing financial condition of Adelphia. In this action, the Rigases are charged with agreeing to avoid paying income taxes. These two different objectives mark two different conspiracies. *See Smith*, 82 F.3d at 1270 (stating "we have drawn a distinction between multiple and single conspiracies based upon the existence of a commitment to a single set of objectives"); *Becker*, 892 F.2d at 265 (find-

ing drug distribution schemes "were two different objectives and agreements, and hence two conspiracies"). Although the Rigases's diversion of Adelphia funds for personal use contributed to the precarious financial condition of the company which the Rigases fraudulently attempted to conceal, this fact shared by the two conspiracies does not merge the two into a single agreement. *See Smith*, 82 F.3d at 1269; *Becker*, 892 F.2d at 268. This is especially so because the Rigases are not charged in this action with conspiring to illegally divert the funds, but rather conspiring to avoid paying taxes on them.

The defendants' separate agreements are also indicated by the distinct victims of the two offenses. The goal of the conspiracy charged in New York was to keep investors and lenders in the dark about the true financial state of Adelphia.[8] The goal

7. While the *Liotard* opinion listed four factors for courts to consider, the Third Circuit has recognized that "it is neither wise nor possible to attempt an exhaustive listing of the factors that may enter into the totality of the circumstances test" and that "[e]ach case is to some extent peculiar unto itself and governed by its own facts." *United States v. Ciancaglini*, 858 F.2d 923, 930 (3d Cir.1988). The decision whether one or more conspiracies exist is thus, to a large extent, a "gut call" based on the particular circumstances of a case, an unsurprising result given the title of the totality of the circumstances test. As one commentator put it:

Distinguishing among conspiracies almost always has an amorphous feel to it. There is no sharp edge or defining set of elements to distinguish one conspiracy from another, and it is hard to escape the sense that courts determine whether there are multiple or single conspiracies on the basis of "feel" rather than precise analysis. Distinguishing between single and multiple conspiracies is reminiscent of the "Ship of Theseus" problem posed by philosophers, in which Theseus's ship is kept intact for years, except that as a board rots away it is taken out and a new one put in its place. As one board after another is rotted away

and replaced, the question is when does the ship cease to be the same ship it was when it was Theseus's? The problem is a nice one, but while the air of paradox that hangs around it is appropriate for philosophers, it does ill-service for answering questions of practical importance to criminal defendants.

Benjamin E. Rosenberg, *Several Problems in Criminal Conspiracy Laws and Some Proposals for Reform*, 43 No. 4 Crim. L. Bull. 1 (July–Aug.2007); *see also* William H. Theis, *The Double Jeopardy Defense and Multiple Prosecutions for Conspiracy*, 49 SMU L.Rev. 269 (Jan.-Feb.1996) (criticizing the frequent lack of emphasis on the conspirators' agreement produced by the multi-factor, totality of the circumstances test).

8. While the New York indictment charged that one of the objectives of the conspiracy was to make false statements in SEC filings, the purpose of these government filings is to protect investors. *See, e.g.*, 15 U.S.C. § 78m (requiring issuers of securities to file with the SEC such reports as the Commission finds "necessary or appropriate for the proper protection of investors"); *United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir.1991) ("The securities laws are designed to make accurate

of the conspiracy charged in this action was to avoid paying taxes owed to the government. This same dichotomy is recognized in the elements of the two clauses of § 371. The defraud clause requires the prosecution to prove that the government was the target of the conspiracy. *Tanner,* 483 U.S. at 128–32, 107 S.Ct. 2739. The offense clause does not. *See supra* at 631–32 n. 6. The different intended victims of the two conspiracies reflect different agreements.

The defendants argue that "[d]istilled to their simplest terms, the two conspiracies allege that members of the Rigas family abused their positions as directors and officers of Adelphia in order to divert Adelphia's assets to themselves" and therefore are the same conspiracy. We reject this attempt to conflate the conspiracies because the defendants' argument reads the charges against them too broadly. The object of the conspiracy with which the Rigases were charged in New York was not their stealing from Adelphia, but their fraudulent misrepresentations to investors and lenders regarding the company. As the Second Circuit noted in discussing the Rigases's looting of Adelphia, "the government did not contend that there was anything inherently wrong or unlawful with a cash management system, with co-borrowing, or commingling. Instead, the failure to properly disclose information was the fraudulent conduct." *Rigas,* 490 F.3d at 218 n. 12. In this case the object of the conspiracy charge is not the Rigases's improper diversion of Adelphia funds, but rather their agreement to avoid paying taxes to the government.

An argument much like the defendants' was rejected in a recent and factually analogous case. In *United States v. Fumo,* No. 06–319, 2008 WL 1731911 (E.D.Pa. Apr.10, 2008), the defendant, Pennsylvania State Senator Vincent J. Fumo, and co-defendants were charged with, among other things, conspiracy to commit mail fraud, conspiracy to commit wire fraud, and a *Klein* conspiracy arising out of allegations that Fumo used Senate employees and the funds and employees of a non-profit organization for his personal needs and caused the non-profit to file false tax returns. Fumo moved to dismiss the conspiracy charges as multiplicitous [9], arguing that they all involved a single conspiracy "to gain personal benefits and gratuities from others, including entities over which he had influence." *Id.* at *4 n. 5. The court rejected this argument, noting that "the Third Circuit does not look to the broadest statement of conspiracies' objects when evaluating whether they are multiplicitous." *Id.* (citing *Becker,* 892 F.2d at 268). The court found that the object of the conspiracies—to defraud the state senate by mail fraud, to defraud the non-profit by wire fraud, and to defraud the IRS by filing false tax returns—were different, and therefore, that the indictment was not multiplicitous in violation of the Double Jeopardy Clause. *Id.* at *4–5.

Similarly in this case, while the Rigases's conduct may broadly be described as endeavoring to gain personal benefit from entities over which they had influence, the objectives of the charged conspiracies are separate and discrete: to conceal Adelphia's true financial condition from investors, analysts and lenders, and to avoid

information available to the investing public.").

**9.** "A multiplicitous indictment charges the same offense in two or more counts and may lead to multiple sentences for a single viola-

tion, a result prohibited by the Double Jeopardy Clause." *United States v. Pollen,* 978 F.2d 78, 83 (3d Cir.1992) (citing *United States v. Stanfa,* 685 F.2d 85, 86–87 (3d Cir.1982)).

paying federal income taxes. Therefore, even under the *Liotard* test, prosecution for both conspiracies does not violate the Double Jeopardy Clause.

### B. Collateral Estoppel

 The defendants' second argument is that the tax evasion counts against them must be dismissed under the principle of collateral estoppel because they were acquitted of the wire fraud charges in the New York action. Although the Fifth Amendment's protection against double jeopardy is not directly implicated by the Rigases's argument because they are accused of two separate offenses, "[t]he Double Jeopardy Clause . . . also embodies principles of collateral estoppel that can bar the relitigation of an issue actually decided in a defendant's favor by a valid and final judgment." *United States v. Merlino*, 310 F.3d 137, 141 (3d Cir.2002) (citing *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)). A final judgment in favor of a criminal defendant is an acquittal. *Id.* at 142. A criminal defendant bears the burden of proving the issue he seeks to foreclose was decided in his favor. *Id.* (citing *Dowling v. United States*, 493 U.S. 342, 350–51, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). To determine whether a prior acquittal bars relitigation of an issue, the court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189.

 The Rigases claim that their acquittal on the charges of wire fraud in the New York action establishes that they did not engage in a scheme to defraud Adelphia by diverting funds from the company for personal use. They argue, therefore, that the government is collaterally estopped from prosecuting them for failing to pay taxes on funds that they never received.

The defendants seek to have us read too much into the New York verdict, and we must decline the invitation to do so. The New York verdict does not actually, or even plausibly, establish that they did not receive funds from Adelphia for their personal use. "To prove . . . wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme." *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir.2004); *see also United States v. Shellef*, 507 F.3d 82, 107 (2d Cir.2007) ("The essential elements of a . . . wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the scheme."). Actual receipt of the money or property which is the object of the scheme to defraud, however, is not an element of a wire fraud charge. Thus, even accepting *arguendo* the defendants' argument that their acquittal on the wire fraud charges necessarily means that the jury concluded they did not engage in a scheme to defraud Adelphia, this conclusion does not establish that they did not receive funds from the company for personal use.

Much more realistic scenarios, *see Ashe*, 397 U.S. at 444, 90 S.Ct. 1189 (stating collateral estoppel in criminal cases must be applied "with realism and rationality"), are that the jury concluded the Rigases received the funds but did so with the company's knowledge or that the Rigases diverted funds from Adelphia but did not do so with the intent of harming the com-

pany. These plausible grounds for the verdict are supported by the fact that the jury convicted the Rigases of defrauding investors and banks, falsifying company books and SEC filings, and a detailed conspiracy to commit these offenses which included overt acts of receiving Adelphia funds for personal use. *See id.* ("The inquiry must be set in a practical frame and viewed with an eye to *all* circumstances of the proceedings.")

■ Even accepting the defendants' argument, the acquittal on the wire fraud charges establishes only that the Rigases did not engage in a scheme to defraud Adelphia, but the government may prosecute the Rigases for tax evasion regardless of whether they received Adelphia funds with the intent to defraud the company. To prove a violation of 26 U.S.C. § 7201, the government must show (1) the existence of a tax deficiency, (2) an affirmative act constituting an attempt to evade or defeat payment of the tax, and (3) willfulness. *United States v. McGill,* 964 F.2d 222, 229 (3d Cir.1992) (citing *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965)). The government need not prove that the tax deficiency resulted from a scheme to defraud Adelphia.

In sum, even if their wire fraud acquittal establishes that the Rigases did not receive Adelphia funds for their personal use with the intent of defrauding the company, it does not establish that they did not receive the funds, and the government may prosecute them for failure to pay taxes on that money. The tax evasion counts of the present indictment are not barred by collateral estoppel.

## III. CONCLUSION

For the foregoing reasons, the Court rejects both the double jeopardy and collateral estoppel arguments set forth in the defendants' motion to dismiss the indictment, and that motion will be denied.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion to Dismiss the Indictment on Double Jeopardy and Collateral Estoppel Grounds is DENIED.