UNITED STATES of America,

v.

John J. RIGAS; Timothy J. Rigas, Appellants.

No. 08–3218.

United States Court of Appeals, Third Circuit.

Argued July 14, 2009.

Opinion Filed: Oct. 21, 2009.

Lawrence G. McMichael, Esq., (Argued), Matthew P. Faranda–Diedrich, Esq., Patrick M. Northen, Esq., Dilworth Paxson, Philadelphia, PA, Joseph U. Metz, Esq., Dilworth Paxson, Harrisburg, PA, for Appellants.

George J. Rocktashel, Esq., (Argued), Martin C. Carlson, Esq., Office of United

States Attorney, Williamsport, PA, Lorna N. Graham, Esq., Office of United States Attorney, Scranton, PA, for Appellee.

Before: RENDELL, FUENTES, and ROTH, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge:

Defendants John and Timothy Rigas (the "Rigases") seek to prevent their trial in the Middle District of Pennsylvania for conspiracy to defraud the United States and for substantive tax evasion violations. The Rigases, who were convicted of conspiracy and substantive fraud counts in the Southern District of New York, but acquitted of wire fraud, claim that their reprosecution in Pennsylvania violates their right to be free from double jeopardy.

The Rigases' principal argument is that the alleged conspiracy (to defraud the United States) charged in Pennsylvania was formed by the same illegal agreement that created the New York conspiracy (to commit offenses against the United States). Because conspiracy to defraud the United States and conspiracy to commit offenses against the United States are different ways of violating a single general conspiracy statute, 18 U.S.C. § 371, the Rigases maintain that they should have been prosecuted under both theories in the same proceeding. The District Court denied the Rigases' motion to dismiss the Pennsylvania indictment.

We agree with the Rigases that 18 U.S.C. § 371 creates a single statutory offense. Because we also find that the Rigases have established a *prima facie* case that there was only one conspiratorial agreement, we will remand to the District Court to conduct an evidentiary hearing on the conspiracy count.

## I. Background[1]

This appeal stems from the 2002 collapse of Adelphia Communications Corporation ("Adelphia"). John Rigas was the founder of Adelphia. Until 2002, he served as Adelphia's Chairman and Chief Executive Officer ("CEO"). His son, Timothy Rigas, was a board member and Chief Financial Officer ("CFO"). Until its disastrous collapse in 2002, Adelphia was the sixth largest cable television provider in the United States. Although the Rigas family did not own a majority of Adelphia's outstanding common stock, they controlled a majority of Adelphia's shareholder votes.[2] As a result, the Rigas family elected eight of Adelphia's nine directors and controlled all of Adelphia's corporate affairs.

In the late 1990s, Adelphia began a process of rapid expansion by acquiring other cable operators. It financed these acquisitions by issuing new corporate stock and taking on corporate debt. As a result of this process, Adelphia became highly leveraged. In order to avoid diluting their control of Adelphia, and to create the appearance that Adelphia was reducing its debt burden, the Rigases purchased large

---

**1.** The following facts relate principally to the areas of overlap between the New York Indictment and Pennsylvania Indictment. They are derived from the indictments in both cases, as well as the background sections of the opinions issued by the District Courts in New York and Pennsylvania as well as the Court of Appeals for the Second Circuit. *See United States v. Rigas,* 565 F.Supp.2d 620 (M.D.Pa.2008); *United States v. Rigas,* 490 F.3d 208 (2d Cir.2007), *cert denied,* — U.S. ——, 128 S.Ct. 1471, 170 L.Ed.2d 296 (2008); *United States v. Rigas,* No. 02–cr–1236, 2008 WL 2544654 (S.D.N.Y. June 24, 2008).

**2.** Adelphia had two classes of common stock: Class A exercised one vote per share, while Class B exercised ten votes per share.

amounts of Adelphia stock and assumed Adelphia's debt. According to the Government, these transactions were a sham. When the true state of Adelphia's finances and operations became clear, Adelphia collapsed.

Prior to June 2002, Adelphia's stock was registered with the SEC and was publicly traded on the NASDAQ National Market System. In January 2002, Adelphia's stock traded at $31.85. By June 2002, Adelphia's stock was worth pennies a share and was delisted by NASDAQ.

In 2002, John and Timothy Rigas were indicted in the Southern District of New York. The New York Indictment charged, among other offenses, a wide-ranging conspiracy to loot Adelphia and to hide both the Rigases' plunder and Adelphia's weak financial condition from the public and the SEC, all in violation of 18 U.S.C. § 371. A jury subsequently convicted the Rigases on the conspiracy count, as well as a number of substantive fraud offenses. However, the Rigases were acquitted of wire fraud and one of the bank fraud counts.

In 2005, the Rigases were indicted in the Middle District of Pennsylvania and charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 by evading the taxes due on their ill-gotten gains. John and Timothy Rigas were also each charged with three counts of tax evasion for the tax years 1998–2000.[3]

## A. The New York Action

On September 23, 2002, a grand jury sitting in the Southern District of New York returned an indictment against John and Timothy Rigas, Michael Rigas (Adelphia's Executive Vice President of Operations and another son of John Rigas), and Michael Mulcahey (an Adelphia executive but not a member of the Rigas family). *See United States v. Rigas, et al.,* No. S1–02–cr–1236 (S.D.N.Y.). A superceding indictment, returned in July 2003, charged the defendants with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. The objects alleged by the conspiracy count were numerous: securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5; wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; making false and misleading statements in SEC filings in violation of 15 U.S.C. § 78ff; falsification of the books of a public company in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, and 17 C.F.R. § 240.13b2–1; and bank fraud in violation of 18 U.S.C. § 1344. The Rigases were also charged in twenty-two substantive counts of wire fraud, bank fraud, and securities fraud. The New York Indictment was supplemented by a Bill of Particulars on January 2, 2004.

After a four-and-a-half month trial, the jury found John and Timothy Rigas guilty of: (1) conspiracy to commit securities fraud, to make false statements to the Securities and Exchange Commission ("SEC"), to falsify Adelphia's books and records, and to commit bank fraud; (2) securities fraud in connection with the purchase or sale of Adelphia Class A stock, debentures, and notes; and (3) bank fraud. They were acquitted of wire fraud. The jury did not reach a conclusion about whether wire fraud was an object of the

---

**3.** In 2008, after the District Court denied the Rigases' double jeopardy motion, a Pennsylvania grand jury returned a Superceding Indictment adding additional substantive tax evasion charges related to the 2001 tax year. The Superceding Indictment also adds additional detail to the conspiracy count. Our review is based on the original Indictment before the District Court at the time it issued its decision, but we note differences between the Indictment and Superceding Indictment where relevant.

conspiracy. The Second Circuit reversed one of the two bank fraud counts, but affirmed the remaining convictions. *Rigas*, 490 F.3d at 236, 239.

John Rigas received a sentence of five years' imprisonment on the conspiracy count, and a total combined sentence of twelve years on all the counts. *United States v. Rigas*, No. 02–cr–1236, 2008 WL 2544654, at *7 (S.D.N.Y. June 24, 2008). Timothy Rigas received a sentence of five years imprisonment on the conspiracy count, and a total combined sentence of seventeen years on all counts. *Id.* Financial penalties were governed by a Settlement Agreement between the Government and the Rigas family, including John Rigas, Doris Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis. The Settlement Agreement did not apply to any tax violations.

### 1. New York Conspiracy Count

Count One of the New York Indictment alleges a wide-ranging conspiracy (1) to create the false appearance that Adelphia's operating performance was strong and that Adelphia was reducing its debt burden, (2) to use Adelphia assets for the personal benefit of members of the Rigas family, and (3) to make false and misleading statements.[4] We focus on the second aspect of the conspiracy, which most close-ly overlaps with the charges in the Pennsylvania Indictment.

### a. Use of Adelphia Assets for Personal Purposes

The New York Indictment alleges that the Rigases used Adelphia funds *"[a]mong other things* ... to construct a golf course on land primarily owned by JOHN J. RIGAS; routinely used Adelphia's corporate aircraft for their personal affairs, without reimbursement to Adelphia; and used at least approximately $252,157,176 in Adelphia funds to pay margin calls against loans to the Rigas family." New York Indictment ¶ 62 (emphasis added).

The New York Bill of Particulars provided specific allegations about some of the "other things" the Rigases used Adelphia funds for. For example, according to the Bill of Particulars: Adelphia purchased real estate from Rigas family members above market value without the property being conveyed to Adelphia; Adelphia purchased real estate for Rigas family members and paid to maintain and renovate that property; Adelphia paid the Rigases' property taxes and insurance premiums; Adelphia paid golf club membership dues for the Rigases, paid expenses related to Ellen Rigas's wedding, and purchased 100 pairs of slippers for Timothy Rigas. The New York Bill of Particulars also alleges that Adelphia made charitable contributions on behalf of the Rigases.[5]

---

4. The following facts are taken from the New York Indictment unless otherwise indicated.

5. The Second Circuit determined that
 [t]he evidence at [the New York] trial showed that throughout the period of the conspiracy, Defendants took over $200 million dollars from Adelphia's Cash Management System for personal expenses ranging from $200 to purchase 100 pairs of bedroom slippers for Timothy Rigas, to over $3 million to produce a film by Ellen Rigas, to $200 million to pay off Rigas family margin loans. The missing money was obscured by the commingling of cash between Adelphia and the [Rigas Managed Entities] and the [Rigas Non–Cable Entities].... No promissory notes were ever signed in favor of Adelphia, and, in some instances, personal expenses were falsely recorded as Adelphia's expenses.... The cash transfers to the Rigas family were not reported as compensation or loans, as required by the SEC, or disclosed to investors as related party transactions.

 *Rigas*, 490 F.3d at 218 (footnote omitted).

#### i. Cash Advances

From about 1999 to 2002, "Adelphia advanced millions of dollars in cash to JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, in excess of their publicly disclosed compensation." New York Indictment ¶ 169. Other unnamed family members also received "substantial amounts of cash." *Id.* In about 2001, John Rigas began receiving monthly cash payments of about $1 million. In April 2001, the Rigases "caused Adelphia to file an amended annual report on Form 10–K, which falsely understated the total amount of compensation to [the Rigases and others] by failing to include the[se] cash advances." *Id.* According to the New York Bill of Particulars, these cash advances totaled nearly $80 million.

#### ii. Golf Course

In June 2001, the Rigases began constructing a golf course on land in Coudersport, Pennsylvania. Adelphia owned a small portion of the land, while John Rigas owned the rest. The Rigases used approximately $13 million in Adelphia funds on golf course equipment, development, and construction.

#### iii. Corporate Aircraft

Adelphia operated three airplanes out of an airport in Wellsville, New York. The Rigases, "and other members of the Rigas family, routinely used the Adelphia Airplanes for personal travel" without reimbursing Adelphia. *Id.* ¶ 192.

#### iv. Stock Purchases

The Rigases also took Adelphia stock without paying for it and used Adelphia assets to pay for their purchases of Adelphia stock. The Rigas family claimed that they were reducing Adelphia's debt by purchasing substantial amounts of Adelphia stock, but they never actually paid for

that stock. Instead, Adelphia "purportedly was compensated for those securities by 'assumptions' by certain [Rigas Family Entities] of debt owed by Adelphia." New York Indictment ¶ 74. These "assumptions" had no financial significance because Adelphia remained "jointly and severally liable for all such debts." *Id.*

According to the New York Bill of Particulars, the Rigases also took shares of common stock owned by Adelphia from Adelphia's vault and placed them in an escrow account for the benefit of the Buffalo Sabres, a hockey team owned by the Rigas family.

Finally, the Rigas family purchased Adelphia stock on margin using stock loans from a number of banks. When the banks made margin calls against the loans, the Rigases had Adelphia pay the loans. According to the New York Indictment, "[t]he Rigas Family did not reimburse Adelphia for the funds used to pay the margin calls." ¶ 185.

#### 2. New York Wire Transfer Counts

The substantive counts in the New York Indictment included five wire fraud counts. They charged that Adelphia made the following fraudulent wire transfers: (1) a September 18, 2001 transfer of $5 million; (2) an October 1, 2001 transfer of $4.5 million; (3) a March 28, 2002 transfer of about $6.4 million; (4) a March 29, 2002 transfer of about $3.9 million; and (5) an April 12, 2002 transfer of about $4.3 million. The Rigases were acquitted of these charges.

#### B. The Pennsylvania Action

On October 6, 2005, a grand jury sitting in the Middle District of Pennsylvania returned an indictment charging John and Timothy Rigas with (1) one count of conspiracy to defraud the United States in

violation of 18 U.S.C. § 371; and (2) six counts of tax evasion in violation of 26 U.S.C. § 7201.

According to the Pennsylvania Indictment, the Rigases' conspiracy to evade income tax dates back to the late 1980's, shortly after Rigas family members sold privately held cable companies to Adelphia.[6] As a result of this transaction, Rigas family members paid over $12.6 million in federal income taxes. "JOHN J. RIGAS and TIMOTHY J. RIGAS stated to an Adelphia employee that they would never pay this large amount of taxes again." Pennsylvania Indictment at 6, ¶¶ 1–2. Timothy Rigas told "Adelphia employees that the Rigas family members should not take large salaries from Adelphia, but should 'live out of the company.'" *Id.* at 6, ¶ 3.

Shortly thereafter, the Rigases began diverting funds from Adelphia accounts to Rigas family members and family-controlled entities. The allegations about these diverted funds closely parallel the allegations in the New York Indictment: To make these transfers look legitimate to the public and outside auditors, Timothy Rigas accounted for many of these transfers as "loans or intercompany receivables owed to Adelphia, so as to evade the payment of income taxes on the diverted funds." Pennsylvania Indictment at 6–7, ¶ 5. The Rigases used Adelphia's funds to purchase the Buffalo Sabres hockey team, to pay personal expenses, to build a golf course, to pay for Adelphia stock, and to pay margin loans used to buy additional Adelphia stock. The Rigases also used Adelphia's corporate aircraft for personal travel. Timothy Rigas occasionally made false accounting entries indicating that the

Rigases had repaid these loans or assumed liability for Adelphia's corporate debt in exchange for the loans. In all, the Pennsylvania indictment alleges that the Rigases diverted $1.9 billion from Adelphia for the personal benefit of Rigas family members,[7] resulting in a tax loss of over $300 million.

The substantive counts of the indictment allege that John Rigas personally evaded approximately $51 million in income tax for the years 1998–2000, and that Timothy Rigas evaded $85 million in income tax for those years.

## II. Discussion

The Rigases maintain that the Pennsylvania conspiracy count violates their right to be free from double jeopardy. They argue that 18 U.S.C. § 371 creates a single statutory offense of conspiracy, and that they can only be tried once for a single conspiratorial agreement in violation of that statute. The Rigases also maintain that the New York jury concluded that they did not take Adelphia's funds for their personal use, and thus that the substantive tax evasion counts are barred by the collateral estoppel component of double jeopardy. The District Court denied the Rigases' motion to dismiss the Pennsylvania Indictment, rejecting both of their arguments.

### A. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. As the Supreme Court has explained:

[T]he guarantee against double jeopardy assures an individual that ... he will not

---

**6.** Unless otherwise indicated, the following facts are derived from the allegations in the original Pennsylvania Indictment.

**7.** The Superceding Indictment alleges that the Rigases diverted an additional $900 million and claims a correspondingly larger tax loss.

be forced ... to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense.... Consequently, if a criminal defendant is to ... enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs.

*Abney v. United States,* 431 U.S. 651, 661–62, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Accordingly, pretrial orders denying motions to dismiss an indictment on double jeopardy grounds are within the "collateral order" exception to the final order requirement. *See United States v. Esposito,* 912 F.2d 60, 61 (3d Cir.1990). We thus have appellate jurisdiction to consider this appeal under 28 U.S.C. § 1291.

▮ Our review of double jeopardy challenges is plenary. *See United States v. Ciancaglini,* 858 F.2d 923, 926 (3d Cir. 1988). "Since collateral estoppel as a bar to reprosecution is a component of the Double Jeopardy Clause and is an issue of law, our review is plenary." *United States v. Merlino,* 310 F.3d 137, 141 (3d Cir.2002).

### B. Double Jeopardy

The double jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Protections against double jeopardy are ancient and we interpret the Double Jeopardy Clause in light of its origin and the line of its growth." *United States v. Rivera,* 384 F.3d 49, 54 (3d Cir. 2004) (citations, quotation marks, and footnote omitted) (noting origins of double jeopardy protections in Greek and Roman law).

▮ A defendant bears the initial burden of presenting evidence to put his double jeopardy claim at issue. *See United States v. Felton,* 753 F.2d 276, 278 (3d Cir.1985). "If the defendant makes a non-frivolous showing of double jeopardy, he is entitled to a pre-trial evidentiary hearing to determine the merits of his claim." *United States v. Liotard,* 817 F.2d 1074, 1077 (3d Cir.1987) (citing *United States v. Inmon,* 594 F.2d 352, 353 (3d Cir.1979)). "Once the defendant has made out his prima facie case, the burden of persuasion shifts to the government to prove by a preponderance of the evidence that the two indictments charge the defendant with legally separate crimes." *Id.* (citing *Felton,* 753 F.2d at 278).

▮ Importantly, the Double Jeopardy Clause prohibits repeat trials for the same *offense,* not for the same *conduct.* Accordingly, a defendant may be subject to multiple prosecutions for the same conduct if Congress intended to impose multiple punishments for that conduct. *Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). In other words, a defendant generally may be subject to multiple prosecutions as long as each prosecution involves a different offense.

▮ In *Blockburger v. United States,* the Supreme Court set forth the well-known test for determining whether Congress intended to separately punish the same course of conduct. 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Blockburger* states that, "where the same act or transaction constitutes a violation of *two distinct* statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* (emphasis added). In other words, "[u]nder the *Blockburger* test, a court looks to the statutory elements of the crime charged to determine if there is any overlap." *United States v. Chorin,* 322 F.3d 274, 281 (3d Cir.2003).

■ The *Blockburger* test is a tool for determining whether Congress intended to separately punish violations of *distinct* statutory provisions, and thus does not apply where a *single* statutory provision was violated. Thus, the Supreme Court did not find *Blockburger* relevant in a case where a "single agreement is the prohibited conspiracy, and however diverse its objects [that agreement] violates but a single statute, § 37 of the Criminal Code," a predecessor to the current general conspiracy statute. *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942). *See also Sanabria v. United States*, 437 U.S. 54, 70 n. 24, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (holding that *Blockburger* test did not apply to violation of a single statute); *United States v. Evans*, 854 F.2d 56, 58 (5th Cir.1988) ("[T]he *Blockburger* test is not applied to find separate offenses where the act or transaction violates but a single statutory provision.") In contrast, in *Albernaz* the Supreme Court concluded that the *Blockburger* test did apply where the defendant's conduct violated multiple conspiracy statutes. 450 U.S. at 339–40, 101 S.Ct. 1137 (distinguishing *Braverman* on the basis that "the conspiratorial agreement in *Braverman*, although it had many objectives, violated but a single statute"). *See also United States v. Xavier*, 2 F.3d 1281, 1290–91 (3d Cir.1993) (applying *Blockburger* test where single statute was clearly divided into separate provisions with different penalty provisions).

■ Both the New York and Pennsylvania actions allege violations of 18 U.S.C. § 371. However, there are two prongs to § 371. The Government maintains that these two prongs create separate offenses. On the other hand, the Rigases maintain that § 371 creates a single offense that can be committed in two ways. Because the parties dispute whether § 371 contains one or more statutory provisions, we must re-solve this threshold question to determine whether *Blockburger* applies.

### 1. Section 371

Title 18, United States Code Section 371 provides, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, *or* to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. (Emphasis added.)

In the New York Indictment, the Government alleges a conspiracy to "commit an offense against the United States." On the other hand, the Pennsylvania Indictment alleges a conspiracy "to defraud the United States."

In *United States v. Alston*, 77 F.3d 713, 718 (3d Cir.1996), we noted that "[§ ] 371 refers to two types of conspiracies." We have also previously described an agreement to defraud the United States and to commit a substantive offense as "a single conspiracy with two objects." *United States v. Schramm*, 75 F.3d 156, 158 (3d Cir.1996) (discussing charge of conspiracy to defraud the United States and to commit mail fraud). However, we have not yet explicitly addressed whether these types of conspiracy are parts of a single statutory offense.

■ In *United States v. Edmonds*, we set forth the considerations that guide our evaluation of whether a single statute creates numerous offenses, or separate means of committing a single offense. 80 F.3d 810, 812 (3d Cir.1996) (en banc) (holding that the individual predicate illegal acts establishing a continuing criminal enterprise are elements of that offense). We

must consider (1) the text and legislative history of the statute; (2) the historical tradition that a jury verdict represents substantial agreement on a discrete set of actions; (3) constitutional considerations; and (4) the rule of lenity. *Id.* at 818–22; *see also United States v. Navarro,* 145 F.3d 580, 589–90 (3d Cir.1998) (applying the *Edmonds* framework to conclude that the federal money laundering statute creates a single offense that can be committed in three alternate ways).

### a. Text and Legislative History

We begin with the text of the statute. Section 371 contains three key provisions. First, "two or more persons conspire." Second, the object of the conspiracy must be "either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." Third, "one or more of such persons do any act to effect the object of the conspiracy."

Although the second provision contains a number of alternatives, this does not suggest that § 371 creates more than one offense. " 'A statute often makes punishable the doing of one thing *or* another, . . . sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who in one transaction does all, violates the statute but once, and incurs only one penalty.' " *Griffin v. United States,* 502 U.S. 46, 51, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (ellipsis in original) (quoting 1 · J. Bishop, New Criminal Procedure § 436, at 355–56 (2d ed.1913)); *see also Schad v. Arizona,* 501 U.S. 624, 635–36, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) ("[L]egislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes."); *United States v. Yeaman,* 194 F.3d 442, 453 (3d Cir.1999) (holding that

statute criminalizing "device, scheme or artifice to defraud, an obtaining of money or property by material misrepresentation, or a transaction that operates as a fraud or deceit on a purchaser" creates single offense (internal quotation marks omitted)); *United States v. Navarro,* 145 F.3d 580, 589–90 (3d Cir.1998) (holding that federal money laundering statute creates a single offense which can be committed in three alternate ways); Fed.R.Crim.P. 7(c)(1) (authorizing a single count to allege that an offense was committed "by one or more specified means"); *Milanovich v. United States,* 365 U.S. 551, 553–54, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961) (holding that defendant cannot be separately convicted under both prongs of 18 U.S.C. § 641, which prohibits embezzling *or* stealing from the United States or receiving such stolen property).

In *United States v. Jerry Smith,* the Ninth Circuit analyzed the text of § 371 and made the following observations about its structure:

> Here the defendants were charged with a conspiracy under separate clauses of the same statute, not two separate statutes. It would be strange to infer that Congress intended to punish twice a conspiracy that violates both clauses. Where a single criminal statute prohibits alternative acts, courts should not infer the legislature's intent to impose multiple punishment.

891 F.2d 703, 712 (9th Cir.1989) (citation omitted).

We agree that under a natural reading, § 371 creates a single offense. The relevant portion of § 371 is not just a single statute, but a single sentence, divided only by commas. The use of the word "either" before "to commit any offense" and "to defraud" suggests that these objects are meant to provide alternatives rather than to create separate offenses. Furthermore,

these alternatives come in the middle of the sentence, and are followed by the description of an additional element.

Although it is limited, the legislative history of § 371 is consistent with this interpretation. The original federal conspiracy statute was enacted in 1867 as part of "An Act to amend existing Laws relating to Internal Revenue, and for other Purposes." *See* 14 Stat. 471, 484 (1867).[8] Because of its incorporation in an act concerning revenue, some believed that both prongs of the conspiracy statute were "directed only at conspiracy to defraud the United States of its revenue." *Jerry Smith*, 891 F.2d at 712. However, the Supreme Court concluded that the conspiracy statute made criminal "every form of conspiracy against the United States, and every form of conspiracy to defraud them." *United States v. Hirsch*, 100 U.S. 33, 35–36, 25 L.Ed. 539 (1879) (noting that it was not unusual for Congress to combine "incongruous legislation" in the same bill).

Further, at the time Congress enacted § 371 in its modern form in 1948, it was aware that the courts interpreted similar language in a predecessor conspiracy statute to create a single offense. *See United States v. Manton*, 107 F.2d 834, 838 (2d Cir.1939) (Sutherland, J.) (holding that the separate prongs of predecessor conspiracy statute created a single offense).[9]

### b. Jury Confusion and Constitutional Considerations

In *Edmonds*, we expressed concern that offenses with a wide range of alternate means are inconsistent with the historical tradition that a jury verdict represents

substantial agreement on a discrete set of facts. 80 F.3d at 818–19. However, conspiracy is a well-established exception to this historical tradition.

 A single conspiracy, like the conspiracy charged in the New York Indictment, can include a wide range of criminal objectives. *See Braverman*, 317 U.S. at 53, 63 S.Ct. 99 ("Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes."). One conspiratorial agreement "cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." *Id.*

As the Ninth Circuit explained in *Jerry Smith:*

> The clause "defraud the United States" merely expands the scope of the offense by including another object of a conspiracy that might not otherwise be covered by the clause "any offense." . . . In other words, where conspiracy is the charge, the established rule is that a charge of conspiracy to commit more than one offense may be included in a single count without violating the general rule against duplicity.

891 F.2d at 712–13.

Treating fraud on the United States as any other object of a conspiracy does little to enlarge the broad sweep of objectives constituting "offenses against the United States." Accordingly, this interpretation of the statute does not offend historical traditions about the jury verdict or due process.

---

8. The original text of the statute was substantially the same as the modern version. *See United States v. Hirsch,* 100 U.S. 33, 35, 25 L.Ed. 539 (1879).

9. Both *Manton* and *Blockburger* were authored by Justice Sutherland. We note that *Manton,* which was written some years later, did not apply the *Blockburger* test to resolve whether the conspiracy statute created one or more offenses.

### c. Rule of Lenity

 "[W]e resolve an ambiguity in favor of lenity when required to determine the intent of Congress in punishing multiple aspects of the same criminal act." *Heflin v. United States*, 358 U.S. 415, 419, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); *see also Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955) ("When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity."). Here, the rule of lenity suggests that if·there were any ambiguity in the statute it should be resolved in favor of concluding that it establishes a single offense.[10] *See* 1A Charles A. Wright, Federal Practice and Procedure § 142 at 14–15 (4th ed. 2008) ("Because a determination that separate offenses are involved makes possible multiple punishment for the same conduct, unless Congress has indicated clearly that it contemplates separate crimes, doubts should be resolved against turning a single transaction against multiple crimes.").

Much of the conduct that satisfies the "defraud" prong of the statute also constitutes an offense against the United States.

For example, obstruction of justice, bribery of public officials, tax evasion, and tax fraud have all been prosecuted under both prongs. *See, e.g., United States v. Bornman*, 559 F.3d 150, 151 (3d Cir.2009) (conspiracy to commit bribery charged under offense prong); *United States v. Manton*, 107 F.2d 834, 839 (2d Cir.1939) (bribery charged under defraud prong); *United States v. Wexler*, 31 F.3d 117, 118 (3d Cir.1994) (tax fraud charged as conspiracy to defraud and to commit offense); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1216 (2d Cir.1983) (conspiracy to file false income tax returns, to make false statements to government agencies, and to obstruct justice charged under offense prong); *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir.1989) (conspiracy to obstruct justice charged under defraud prong). If § 371 created two separate offenses, then conspiracy to commit any of these offenses could be prosecuted twice in the same indictment, based on the same proof, and could result in multiple consecutive sentences. The overlapping nature of the two prongs both suggests that Congress intended to create only one offense, and highlights the appropriateness of applying the rule of lenity. *Cf. United States*

---

**10.** While we find that the statute clearly creates a single offense, we note that the Government should be willing to concede that the statute is at least ambiguous; United States Attorneys' Offices in the Third Circuit, including the United States Attorney's Office for the Middle District of Pennsylvania, have charged both prongs of § 371 as a single offense. *See, e.g., United States v. Donahue*, 885 F.2d 45, 46 (3d Cir.1989) (Middle District of Pennsylvania charged conspiracy to defraud and to avoid filing currency transaction reports); *United States v. Kemmel*, 160 F.Supp. 718, 720 (M.D.Pa.1958) (holding that indictment charging single count of conspiracy to defraud the United States and to commit an offense against the United States was not duplicitous because "[t]he conspiracy is the crime, and that is one, however diverse its objects" (citation and quotation marks omit-

ted)); *see also United States v. Auffenberg*, 539 F.Supp.2d 781, 783 (D.Vi.2008) (conspiracy to commit wire fraud and to defraud the United States charged in one count); *United States v. Alston*, 77 F.3d 713, 714 (3d Cir. 1996) (Eastern District of Pennsylvania charged conspiracy to defraud and to commit financial structuring); *United States v. Schramm*, 75 F.3d 156, 158 (3d Cir.1996) (Western District of Pennsylvania charged conspiracy to defraud and to commit mail fraud); *United States v. Wexler*, 31 F.3d 117, 118 (3d Cir.1994) (District of New Jersey charged conspiracy to defraud and to prepare false tax returns in violation of federal law); *United States v. Shoup*, 608 F.2d 950, 953 (3d Cir.1979) (Eastern District of Pennsylvania charged conspiracy to defraud and to obstruct justice in a single count).

*v. Yeaman*, 194 F.3d 442, 453 (3d Cir.1999) (focusing on overlapping nature of alternatives in fraud statute in holding that it created single offense).

 For these reasons, we join the majority of the Circuit Courts of Appeals to consider the issue and conclude that § 371 creates a single offense. *See, e.g., United States v. Manton*, 107 F.2d at 839 (Sutherland, J.) (holding that indictment was not "bad for duplicity because it alleges that the conspiracy contemplated the violation of a criminal statute and also the defrauding of the United States"); [11] *United States v. Williams*, 705 F.2d 603, 623–24 (2d Cir.1983) (indictment alleging offense and defraud conspiracy in same count not duplicitous); *United States v. Wiley*, 979 F.2d 365, 367–68 (5th Cir.1992) (same); *United States v. Pierce*, 479 F.3d 546, 552 (8th Cir.2007) ("Each of the three sets of object offenses—fraudulent tax returns, mail fraud and wire fraud—further the general agreement and are multiple facets of one conspiracy."); *United States v. David Smith*, 424 F.3d 992, 1000 (9th Cir.2005) (analyzing charges under different prongs as single offense "[b]ecause all three conspiracy counts in this case violate the same statute"); *United States v. Jerry Smith*, 891 F.2d 703, 712–13 (9th Cir.1989) (holding that single indictment count charging both provisions of § 371 was not duplicitous), *amended as to form of opinion only*, 906 F.2d 385 (9th Cir.1990); *United States v. Hauck*, 980 F.2d 611, 615 (10th Cir.1992) (holding that single conspiracy count to defraud government agency and to commit other substantive offenses was not duplicitous because "it is permissible to charge a single offense but specify alternative means to commit the offense"); *United States v. Harmas*, 974 F.2d 1262, 1266 (11th Cir.1992) ("The statute is written in the disjunctive and should be interpreted as establishing two alternative means of committing a violation."); *May v. United States*, 175 F.2d 994, 1003 (D.C.Cir.1949) (rejecting argument that "a conspiracy to violate a criminal statute and to defraud the United States was two offenses"). *But see United States v. Haga*, 821 F.2d 1036, 1043 (5th Cir.1987) ("Count I must have charged a conspiracy *either* to 'commit any offense' *or* to 'defraud the United States'; it cannot have charged both."); *United States v. Ervasti*, 201 F.3d 1029, 1039 (8th Cir.2000) ("Though it is not divided formally into subsections, § 371 plainly establishes two offenses."); *United States v. Thompson*, 814 F.2d 1472, 1475–77 (10th Cir.1987) (holding that defendant had not presented a discernable double

11. The Government urges us to disregard cases holding that § 371 creates a single statute for the purposes of duplicity. We reject this argument.

"Duplicity is the improper joining of distinct and separate offenses in a single count. Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary rulings, or endanger fair sentencing." *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir.1998) (internal citations omitted). The issue in both duplicity and double jeopardy is whether Congress intended to create one offense or two. *See, e.g., United States v. Conley*, 37 F.3d 970, 980 (3d Cir.1994) ("In con-

ducting a double jeopardy analysis, the goal is to ascertain legislative intent and to apply the statute at issue, as written, in keeping with that intent"); 1A Wright, § 142, at 17–20 (noting that "the real question [in analyzing an indictment for duplicity] is one of legislative intent, to be ascertained from all the data available"); *cf. Milanovich v. United States*, 365 U.S. 551, 553–54, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961) (noting that issue of whether statute was designed to create two punishments for the same criminal act is one of statutory interpretation). Further, "one vice of duplicity is that a general verdict ... could prejudice the defendant in protecting himself against double jeopardy." *United States v. Starks*, 515 F.2d 112, 116 (3d Cir.1975).

jeopardy claim notwithstanding that first prosecution charged conspiracy to commit mail fraud under "offense" prong of § 371 and second charged conspiracy to impede lawful function of United States under "defraud" prong of § 371).[12]

## 2. Totality of the Circumstances

 Having determined that § 371 creates a single statutory offense, we must determine whether the Rigases' conduct violated that statute multiple times or only once. The Double Jeopardy Clause prohibits the Government from "splitting one conspiracy into several prosecutions." *United States v. Becker*, 892 F.2d 265, 268 (3d Cir.1989). However, it can be difficult to distinguish whether a course of conduct constitutes one conspiracy or two using the generally applicable *Blockburger* test. In particular, a single conspiracy may be divided into multiple prosecutions, each alleging different overt acts. In such a case, "[t]he danger is that successive indictments against a single defendant for participation in a single conspiracy might withstand same evidence scrutiny [under the *Blockburger* test] if the court places undue emphasis upon the evidence used to prove the commission of the overt acts alleged." *United States v. Liotard*, 817 F.2d 1074, 1078 (3d Cir.1987); *cf. Krulewitch v. United States*, 336 U.S. 440, 447, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J. concurring) (noting that "chameleon-like, [conspiracy] takes on a special coloration from each of the many independent offenses on which it may be overlaid").

To resolve this problem, the courts of appeals, including the Third Circuit, have developed a "totality of the circumstances" test to distinguish conspiracy prosecutions based on the same conspiracy statute. *See, e.g., Becker*, 892 F.2d at 268. This test directs a district court to look at the totality of the circumstances involved in each offense.

 The ultimate goal of the totality of the circumstances test is to determine "whether there are two agreements or only one." *United States v. J. David Smith*, 82 F.3d 1261, 1267 (3d Cir.1996); *see also Becker*, 892 F.2d at 268 ("The critical determination is whether one agreement existed."). In assessing this issue, the Third Circuit considers whether:

> (a) the *"locus criminis"* of the two alleged conspiracies is the same; (b) there is a significant degree of *temporal overlap* between the two conspiracies charged; (c) there is an overlap of *personnel* between the two conspiracies (including unindicted as well as indicted coconspirators); and (d) the overt acts charged and [ (e) ] the *role played* by the defendant according to the two indictments are similar.

*Liotard*, 817 F.2d at 1078 (emphasis added and internal citations omitted). In other words, the defendant must show that place, time, people, action, and responsibilities are similar in both prosecutions. However, this list is not exhaustive and "different conspiracies may warrant emphasizing different factors." *J. David Smith*, 82 F.3d at 1267. Other factors that may prove helpful in determining whether an indictment charges one or more conspiracies are: "(1) 'whether there was a common goal among the conspirators'; (2) 'whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators'; and (3) 'the extent to which the participants overlap in the various dealings.' " *United States v. Kemp*, 500 F.3d 257, 287 (3d

---

**12.** Thus, the Second, Ninth, Eleventh, and D.C. Circuits have held that § 371 creates one offense. The Fifth, Eighth and Tenth Circuits have conflicting precedent.

Cir.2007) (quoting *United States v. Kelly,* 892 F.2d 255, 259 (3d Cir.1989) (setting forth test for determining whether a single conspiracy count should have been charged as multiple conspiracies)).

 Further, in applying the test a district court must "assure that the substance of the matter controls and not the grand jury's characterization of it." *J. David Smith,* 82 F.3d at 1267. Thus, a court must "look into the full scope of activities described and implied in the indictments." *Id.* at 1268 (holding that "we must look to the entire record before the district court").

In *Liotard,* the defendant had been acquitted of a § 371 conspiracy to violate 18 U.S.C. § 2314 by transporting stolen goods in interstate commerce. 817 F.2d at 1076. He was subsequently charged with § 371 conspiracy to violate 18 U.S.C. § 659 by stealing from an interstate shipment of goods. *Id.* The District Court declined to conduct a hearing on the defendant's double jeopardy claim. *Id.; see also United States v. Liotard,* 638 F.Supp. 1101, 1104 (D.N.J.1986). We applied the totality of the circumstances test and concluded that the defendant had made out a nonfrivolous showing of double jeopardy: merchandise was stolen from the same place; the period of the conspiracy charged in the first indictment was entirely subsumed within the period of time set out in the second indictment; the principal coconspirator was the same in both indictments; the nature of the overt acts charged in the two indictments were nearly identical; and the defendant played the same role in each charged indictment. *Liotard,* 817 F.2d at 1078–79. We found that it was immaterial that the two indictments alleged different acts of theft. *Id.* at 1079. We similarly found that it was not significant that the two indictments alleged conspiracy to commit different underlying offenses. *Id.* at

1078 n. 7 (holding that "these differences in statutory violation are immaterial and fortuitous"). Thus, we concluded that Liotard was entitled to a pretrial evidentiary hearing. *Id.* at 1079.

*United States v. Kemp,* like the instant case, involved allegations of widespread but abstract financial misconduct. 500 F.3d at 264. Kemp and his codefendants were charged with a conspiracy that involved a variety of fraudulent transactions, including extension of otherwise-unavailable loans to government officials, direct bribes to those officials, and direction of government contracts to companies within defendants' control. *Id. Kemp* is, thus, both more factually similar than *Liotard*— which involved alleged conspiracies to steal and transport stolen goods, see 817 F.2d at 1076—and more recent. Accordingly, we begin with the *Kemp* factors.

### a. Kemp Test

#### i. "Common goal among the conspirators"

The first *Kemp* factor is whether there was a common goal among the conspirators. *Kemp,* 500 F.3d at 287. The Government urges us to focus on the objectives of the conspiracies charged in the two indictments, arguing that the object of the New York conspiracy was to commit securities fraud, wire fraud, bank fraud, to file false reports with the SEC, and to falsify the books and records of Adelphia, while the object of the Pennsylvania conspiracy was to defraud the IRS.

 However, this argument misses the point of the totality of the circumstances test. In *Liotard,* we specifically rejected including objects of the charged conspiracies in that test. 817 F.2d at 1078 n. 7. It is well established that a single conspiratorial agreement can envisage the violation of several statutes. *See, e.g.,*

*Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942). Further, the Government's approach would give undue weight to the "grand jury's characterization" of the Rigases' conduct, instead of focusing on the "substance of the matter." *J. David Smith*, 82 F.3d at 1267. Thus, in considering whether the defendants had a common goal we look to the underlying purpose of the alleged criminal activity. *See, e.g., United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir.2007) (describing common goal as "to make money by depositing stolen and altered corporate checks into business accounts"); *Kelly*, 892 F.2d at 259 (describing common goal as "to make money selling 'speed' ").

■ As set forth above, in the Pennsylvania Indictment the Government alleges that, after a particularly high tax bill, the Rigases decided "that they would never pay [a] large amount of taxes again." Pennsylvania Indictment at 6, ¶¶ 1–2. To accomplish this purpose, the Rigases decided that "Rigas family members should not take large salaries from Adelphia, but should 'live out of the company.' " *Id.* To avoid detection, the Rigases engaged in sham transactions to conceal their use of corporate assets. Of course, to conceal their income from the Government, the Rigases also had to conceal it from the public in general, including shareholders. The New York Indictment simply targeted this aspect of the Rigases' scheme. Further, it is not dispositive that the conspiracy charged in the New York Indictment was broader than the Pennsylvania Indictment. The charges in both indictments relate to a common goal of enriching the Rigases through Adelphia. A "master conspiracy [can involve] more than one subsidiary scheme." *United States v. Kenny*, 462 F.2d 1205, 1216 (3d Cir.1972).

The allegations related to conversion of Adelphia funds by the Rigases—a subsidiary scheme within the New York Indictment—appear to be the same in both indictments.

### ii. Continuous Result Requiring Continuous Cooperation

■ The second *Kemp* factor is whether "the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators." *Kemp*, 500 F.3d at 287. The first part of this factor overlaps with the time factor from the *Liotard* test. In evaluating the "cooperation" part of this factor "we look to whether there was evidence that the activities of one group were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir.2007) (internal quotation marks, ellipsis, and citation omitted). In other words, we consider whether all aspects of the scheme were interdependent. *Cf. Kemp*, 500 F.3d at 289 ("[I]nterdependence serves as evidence of an agreement; that is, it helps establish whether the alleged coconspirators are all committed to the same set of objectives in a single conspiracy." (internal citation and quotation marks omitted)).

As to time, the Pennsylvania Indictment covers a wider time span than the New York Indictment, but again the key years in both conspiracies are the same. The Pennsylvania Indictment alleges that the conspiracy lasted from "November 1989, through the date of the indictment [2005]," but only describes overt acts occurring between 1998 and 2002.[13] Pennsylvania Indictment at 2. The majority of the allegations in the conspiracy count relate to

---

13. The Pennsylvania Superceding Indictment expands the period of the conspiracy to include 1989 to 2008, but does not allege any continuing conspiratorial activity after 2002.

the period between 1996 and 2002. The alleged tax loss is further limited to the period of 1998 to 2000.[14]

The New York Indictment charged a conspiracy between 1999 and May 2002. However, the New York Indictment suggests that the Rigases' conspiratorial conduct began well before 1999. The Bill of Particulars further alleges that the Rigases began using Adelphia funds for their personal benefit "[f]rom at least . . . 1993." Bill of Particulars ¶ 81. Because the New York Indictment does not purport to reach the origin of the Rigases' conspiracy, we do not find it significant that its charges began later than those in the Pennsylvania Indictment.

As to interdependence, we again reiterate that the Government claims that the Rigases appropriated money from Adelphia to avoid taking salaries on which they would have had to pay income tax. *See* Pennsylvania Indictment at 6, ¶¶ 1–2 ("JOHN J. RIGAS and TIMOTHY J. RIGAS stated to an Adelphia employee that they would never pay this large amount of taxes again."; Timothy Rigas told "Adelphia employees that the Rigas family members should not take large salaries from Adelphia, but should 'live out of the company.' ") Further, the Rigases had to hide their misuse of Adelphia's corporate assets from the public in order to avoid detection of their income by the Government.

### iii. Overlapping Participants

Both the *Liotard* and *Kemp* tests direct us to consider overlap in the participants

of the two conspiracies. The Rigases were the main actors in both indictments. Other members of the Rigas family are also central to both indictments.

The New York Indictment named a number coconspirators including Michael Rigas, Michael Mulcahey, James R. Brown, and Timothy A. Werth.[15] Although other Rigas family members were not specifically named in the New York indictment many of the allegations relate to "the Rigas family," including John Rigas's "wife, sons, daughter and son-in-law." New York Indictment ¶ 2. For example, the New York Indictment alleges that "Adelphia advanced substantial amounts of cash to other members of the Rigas Family," *id.* ¶ 169, and that the Rigases caused Adelphia to file a Form 10–K "which falsely understated the total amount of compensation to . . . another member of the Rigas Family by failing to include the[se] cash advances," *id.* ¶ 173. The Bill of Particulars also listed at least nine members of the Rigas family who used the Adelphia corporate aircraft for personal travel.

Similarly, the Pennsylvania Indictment alleges that the Rigases conspired with others known and unknown. It also alleges that the Rigases caused Michael Rigas, James Rigas, and Ellen Rigas to underreport their income.

### b. Remaining *Liotard* Factors

### i. Place

The New York Indictment is geographically broader than the Pennsylvania indict-

---

**14.** The Pennsylvania Superceding Indictment expands the alleged tax loss to include the 2001 tax year.

**15.** Mulcahey was responsible for managing Adelphia's treasury, including "the supervision of money flowing into and out of Adelphia." New York Indictment ¶ 5. Brown was responsible for raising capital for Adelphia through securities transactions and bank

loans. Werth was the Director of External Reporting for Adelphia. He was responsible for supervising the preparation of Adelphia's financial statements.

The New York Bill of Particulars named an additional seventeen unindicted co-conspirators, and described three additional possible co-conspirators under on-going investigation.

ment, but both conspiracies occurred nationwide, and both Indictments focus on the Rigases' homes and Adelphia's corporate headquarters in Pennsylvania.

The Pennsylvania Indictment specifically names Coudersport, Pennsylvania; Buffalo, New York; Beaver Creek, Colorado; and New York City as places where acts related to the conspiracy took place. The New York Indictment also involves these locations. While the New York Indictment does not specifically identify Buffalo or Beaver Creek, the Bill of Particulars does include allegations related to those locations.

We do not find it significant that the New York Indictment also included misrepresentations to investors across the nation. The allegations related to conversion of Adelphia funds by the Rigases—a subsidiary scheme within the New York Indictment—appear to be the same in both indictments, and thus occurred in the same locations.

#### ii. Overt Acts

Both indictments seem to allege conversion of the same assets, by the same means, in the same transactions. Certainly, each indictment alleges acts not contained in the other. The New York Indictment, which alleges both fraudulent misrepresentations about Adelphia's finances and performance, and fraudulent concealment of the fact that the Rigases were misusing corporate assets for personal purposes, is far broader than the Pennsylvania Indictment. Further, the Pennsylvania Indictment includes allegations related to filing income tax returns, which are not included in the New York Indictment. However, key overt acts in both indictments are transactions in which the Rigases secretly took Adelphia's corporate assets.

#### iii. Role Played by Defendants

The defendants were central figures in both conspiracies. They caused the wrongful transactions, and were personally responsible for hiding those transactions.

Putting all of these factors together the Rigases have made out a non-frivolous showing of double jeopardy. The New York conspiracy alleges that the Rigases took Adelphia's corporate assets for their personal use and hid those transactions from investors and regulators. The Pennsylvania conspiracy alleges that one reason the Rigases took those same assets was to avoid publicly receiving large salaries on which they would have been required to pay income tax. Because both indictments concern the same underlying transactions, they relate to the same time and place and involve the same core group of participants. Both indictments have a common goal, and individual overt acts in both indictments were interdependent. Accordingly, the Rigases have established a strong inference that there was a single agreement. On remand, the Government will bear the burden of proving by a preponderance of the evidence that the Rigases entered into two separate agreements.

### C. Collateral Estoppel

■ The Rigases also argue that the substantive counts of tax evasion should be dismissed based on collateral estoppel. The Rigases maintain that, in acquitting them of the substantive counts of wire fraud, the New York jury must have found that any assets the Rigases obtained from Adelphia constituted legitimate loans, rather than income.

■ "The Double Jeopardy Clause . . . embodies principles of collateral estoppel that can bar the relitigation of an issue actually decided in a defendant's favor by a valid and final judgment." *United States*

*v. Merlino,* 310 F.3d 137, 141 (3d Cir.2002); *see also Ashe v. Swenson,* 397 U.S. 436, 444–45, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The doctrine of collateral estoppel ensures that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. 1189.

The Rigases seem to argue that collateral estoppel bars the Government from re-litigating the issue of whether they misappropriated *any* of Adelphia's assets. However, the New York jury only returned a final judgment of acquittal as to five individual transactions set forth in Counts 17–21 of the New York Indictment: (1) a September 18, 2001 transfer of $5 million; (2) an October 1, 2001 transfer of $4.5 million; (3) a March 28, 2002 transfer of about $6.4 million; (4) a March 29, 2002 transfer of about $3.9 million; and (5) an April 12, 2002 transfer of about $4.3 million.[16] Accordingly, even if we found that collateral estoppel applied, it would only preclude the Government from claiming that the Rigases avoided paying taxes on the $24 million involved in those particular transactions.

■■■■■ In a criminal case, a defendant bears the burden of demonstrating that the issue he seeks to foreclose was actually decided in the first proceeding. *See Dowling v. United States,* 493 U.S. 342, 350–51, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). This is a heavy burden. *United States v. Console,* 13 F.3d 641, 665 (3d Cir.1993) (" 'When a case involves a general verdict, establishing that the verdict necessarily determined any particular issue is extremely difficult.' " (quoting *United States*

*v. Bailin,* 977 F.2d 270, 282 (7th Cir. 1992))). "[S]ince it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant." *United States v. McGowan,* 58 F.3d 8, 12 (2d Cir.1995) (citation omitted). Further, "[t]o claim the benefit of collateral estoppel [a defendant] must prove that the [first] jury *unanimously* acquitted him." *Merlino,* 310 F.3d at 141 (emphasis added).

■■■■ However, "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189. Thus, the government cannot avoid the preclusive effect of a general jury verdict by speculating that the verdict could have been based upon a finding that the government had failed to prove elements that were never contested by the defense. *Id. Ashe* arose out of a multi-victim armed robbery occurring at a poker game in the basement of a home. *Id.* at 437, 90 S.Ct. 1189. During his first trial, Ashe was charged with robbing one of the participants. The only defense offered at trial was that Ashe was not present at the robbery. After Ashe was acquitted, the government sought to try the defendant a second time for allegedly robbing a different player at the same game. *Id.* at 439, 90 S.Ct. 1189. The Supreme Court held that the jury's verdict in the first trial necessarily established that the defendant was not one of the robbers and, therefore, precluded the government from relitigating that issue. *Id.* at 445–46, 90 S.Ct. 1189

---

**16.** These transactions relate to "margin loans" the Rigases borrowed from third parties to buy Adelphia stock on behalf of their family. The transactions listed above correspond to payments the Rigases caused Adelphia to make as payments on those loans. These transactions are also described as overt acts in the Pennsylvania Indictment.

(holding that "[t]he single rationally conceivable issue before the jury was whether the [defendant] had been one of the robbers").

■ To determine whether collateral estoppel bars retrial following a general verdict of acquittal, a court must examine the record of the prior proceeding and ask "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* at 444, 90 S.Ct. 1189. "The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Id.* (internal quotation marks omitted). Nonetheless, the Rigases fall far short of meeting their burden of establishing that they are entitled to collateral estoppel.

The Rigases maintain that the issue in the New York prosecution was whether the assets they received from Adelphia were income or legitimate loans. To succeed on their collateral estoppel claim, the Rigases would have to convince us that the *only* question at issue in the New York trial was whether the Rigases received the wire transfers as income.[17] In other words, the Rigases would have to show that their *only* defense was that they believed that the wire transfers were legitimate loans. However, the record is barely sufficient to establish that this was a defense *at all.*

The record includes an excerpt from the New York trial in which defense counsel argued to the judge that proving the transfers were legitimate loans was a valid defense. In this excerpt, the Government argued that the question of whether the transfers were loans or compensation was irrelevant because the real issue was whether the transfers were appropriately disclosed.

The parties also submitted excerpts of the Government's closing argument. The Government argued that the transfers were not loans, but also argued that the transfers were not appropriately disclosed. The parties did not submit the Rigases' closing argument, nor did they submit the New York jury instructions. Accordingly, it is impossible to determine with any certainty what defenses were raised at the New York trial. But, the record does suggest that there were other contested issues. Accordingly, the Rigases have failed to meet their burden of demonstrating that the New York trial definitively decided that the wire transfers were not compensation. Thus, we will affirm the District Court's denial of the Rigases' motion to dismiss the tax evasion charges in the Pennsylvania Indictment.

### III. Conclusion

For the reasons stated above, we will remand to the District Court to conduct an evidentiary hearing in accordance with *Liotard* on whether the conspiracy charged in the Pennsylvania Indictment was part of the conspiratorial agreement charged in the New York Indictment. However, we will affirm the District Court's denial of the Rigases' motion on collateral estoppel grounds.

RENDELL, Circuit Judge—dissenting.

The majority renders complex what I suggest is a straightforward issue, susceptible of a straightforward analysis under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The only relevant question required to be

---

17. Under 18 U.S.C. § 1343, a defendant is guilty of wire fraud if he has devised a scheme to obtain money or property by means of fraud; and transmitted any communication by wire in interstate commerce for the purpose of executing the scheme.

asked and answered here is whether the two types of conspiracy crimes outlined in 18 U.S.C. § 371, conspiracy to commit an offense against the United States and conspiracy to defraud the United States, constitute separate offenses, requiring proof of different elements, and for which different cumulative punishments can be meted out. I suggest that the answer is clearly and unequivocally "yes," they are distinct offenses. Two of the three courts of appeals that have addressed this precise issue, have so held.[18] Given that, the first part of the majority opinion, which reasons to the contrary, is wrong. The second part, which applies a test that is useful *only if* the fact pattern involved two alleged conspiracies for the *same* criminal offense (e.g. successive prosecutions for conspiracy to commit mail fraud) is unnecessary.[19]

The majority seizes on the use of the phrase "distinct statutory provisions" in *Blockburger* as indicating that its test only

applies when the successive offenses are found in different statutes. 284 U.S. at 304, 52 S.Ct. 180. But that is not what *Blockburger* says. Rather it refers to "distinct statutory provisions."[20] "Distinct" means "distinguished from all others." WEBSTER's II NEW RIVERSIDE DICTIONARY 390 (1988). "Provision" means "[a] *clause in a statute,* contract or other legal instrument." BLACK's LAW DICTIONARY 1345 (9th ed.2009)(emphasis added). To say that the two provisions in § 371 are not distinct is to equate conspiracy to commit an offense with conspiracy to defraud. That makes no sense. Moreover, as is discussed in more detail below, application of *Blockburger* is the way to determine the intent of Congress, and its application here leads to the conclusion that not only are these distinct provisions, but because the elements differ greatly, Congress intended different punishments and double jeopardy does not prevent the Rigases' prosecution for conspiracy to evade taxes.[21]

**18.** *See United States v. Ervasti,* 201 F.3d 1029, 1039–40 (8th Cir.2000) (finding that § 371 clearly establishes two offenses); *United States v. Thompson,* 814 F.2d 1472, 1476–77 (10th Cir.1987) (applying *Blockburger* to § 371 to determine that double jeopardy does not bar prosecutions for conspiracy to commit mail fraud and conspiracy to defraud the United States); *but see United States v. Smith (David L.),* 424 F.3d 992, 1000 (9th Cir.2005) (declining to apply *Blockburger* to assess double jeopardy because all of the conspiracy counts at issue alleged a violation of the same statute, § 371).

**19.** The majority does not refer to the comprehensive, thoughtful, 38 page opinion of the District Court concluding that double jeopardy does not apply. I agree entirely with Judge Jones' reasoning and I commend the District Court opinion to the reader as its clarity is persuasive. *See United States v. Rigas,* 565 F.Supp.2d 620 (M.D.Pa.2008).

**20.** "The applicable rule is that, where the same act or transaction constitutes a violation of two *distinct statutory provisions,* the test to be applied to determine whether there are

two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180 (emphasis added).

**21.** The majority relies on inapposite cases that tend to cloud the issue. *United States v. Evans* and *Sanabria v. United States* dealt with single act—single statutory provision offenses. 854 F.2d 56 (5th Cir.1988); 437 U.S. 54, 98 S.Ct. 2170 (1978). *Braverman v. United States* involved the issue of "duplicity" where a single conspiracy had several objects and differentiated that fact pattern from cases in which a single act violated two statutes. 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). These cases are factually distinguishable and not controlling. Moreover, as I suggest is the correct approach here, the *Xavier* court applied the *Blockburger* test in order to assess whether two crimes under a *single statute* that was divided into distinct statutory provisions were the "same offense." 2 F.3d 1281, 1291 (3d Cir.1993).

If there were a doubt as to Congress' intent as to whether these are distinct offenses, one need only look at a consideration deemed significant by the Supreme Court—the specific evil sought to be addressed by the respective provisions. *See Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) ("The conclusion we reach today regarding the intent of Congress [to create distinct statutory offenses] is reinforced by the fact that the two conspiracy statutes are directed to separate evils presented by drug trafficking."). Virtually without exception, courts of appeals have held that the "offense" and "defraud" clauses aim to protect different actors and redress distinct social harms.[22] On the one hand, the "defraud" clause focuses narrowly on conspiracies targeting the federal government. *See United States v. Brandon*, 17 F.3d 409, 422 (1st Cir.1994); *United States v. Falcone*, 960 F.2d 988, 990 (11th Cir.1992) (en banc); *United States v. Thompson*, 814 F.2d 1472, 1476–77 (10th Cir.1987). Its purpose is two-fold: (1) to ensure the integrity of the federal treasury and (2) to promote the smooth effective operation of the federal bureaucracy. Accordingly, the "defraud" clause prohibits efforts not only to cheat the government out of property or money but also to interfere with or obstruct the operation of government by deceit, craft, trickery, or at least by means that are dishonest. *See United States v. Arch Trading Co.*, 987 F.2d 1087, 1091–92 (4th Cir.1993); *see also Hammerschmidt v. United States*, 265 U.S. 182, 188, 44

S.Ct. 511, 68 L.Ed. 968 (1924). On the other hand, the "offense" clause aims to protect the public generally. *Brandon*, 17 F.3d at 422. Accordingly, its applicability does not hinge on the identity of the target, which need not be the federal government. *Id.* Nor does the "offense" clause require proof of interference with government operations. Rather, it broadly embraces conspiracies aimed at violating any federal law. *Id.; see also United States v. Hirsch*, 100 U.S. 33, 35–36, 25 L.Ed. 539 (1879). Thus, contrary to the majority's contention, the two prongs of § 371 do not simply describe alternative means of committing the same offense, but instead describe two distinct crimes.

The majority maintains that its position reflects the holding of the "majority of the Circuit Courts of Appeals to consider the issue." Just the opposite is true: the Ninth Circuit Court of Appeals alone has held that the "offense" and "defraud" clauses identify the same offense for double jeopardy purposes. *Smith (David L.)*, 424 F.3d 992. In fact, two other courts of appeals have concluded that Congress intended to authorize cumulative punishment for violation of both provisions. In *Ervasti*, 201 F.3d at 1039–40, the Eighth Circuit reasoned that § 371, which uses "either ... or" language, "plainly establishes two offenses." It bolstered this conclusion by noting the unique elements of proof required for the "offense" and "defraud" crimes. In *Thompson*, 814 F.2d at 1476–77, the Tenth Circuit, applying

---

**22.** *See United States v. Alston*, 77 F.3d 713, 718 (3d Cir.1996) (noting that § 371 refers to "two types of conspiracies"); *United States v. Tham*, 960 F.2d 1391, 1399 (9th Cir.1991) (noting that the "offense" and "defraud" clauses of § 371 identify two separate conspiracies with two separate objectives); *see also United States v. Vazquez*, 319 F.2d 381, 384 (3d Cir.1963) ("The general conspiracy section of the Criminal Code, 18 U.S.C.A.

§ 371 ... condemns two types of conspiracies."); *United States v. Brandon*, 17 F.3d 409, 422 (1st Cir.1994) ("18 U.S.C. § 371 creates two distinct criminal offenses: conspiracies to commit offenses against the United States and conspiracies to defraud the United States."); *United States v. Haga*, 821 F.2d 1036, 1039 (5th Cir.1987) (noting that § 371 "criminalizes conspiracies of two sorts").

*Blockburger,* also found no "colorable claim" of double jeopardy. These courts had no difficulty reaching this conclusion, presumably because the two offenses are so clearly separate and distinct as a matter of substance. *Smith,* on the other hand, relied solely on form, and concluded without discussion that *Blockburger* did not apply because both crimes appear in the same statute. I submit that *Ervasti* and *Thompson* are more persuasive.[23]

The majority relies on cases interpreting § 371 in the duplicity context as authority for purposes of double jeopardy. The principle of duplicity emanates from Fed.R.Crim.P. 8(a), which prohibits the government from charging separate offenses in a single indictment count. Several courts of appeals have concluded that the "offense" and "defraud" clauses do not constitute separate offenses for purposes of Rule 8(a). While at first blush, application of these precedents to the double jeopardy context seems sensible, I submit that the finding that the "offense" and "defraud" clauses are not separate offenses for duplicity purposes does not control the analysis for double jeopardy purposes. Rule 8(a) serves three key purposes: (1) to ensure the defendant receives adequate notice of the offenses charged; (2) to minimize the risk that jurors were not unanimous as to the particular offenses charged; and (3) to enable precise determination of the particular offenses of which the defendant was convicted or acquitted, critical to avoid reprosecution of the defendant for the same offense. *See United States v. Margiotta,*

646 F.2d 729, 733 (2d Cir.1981); *United States v. Murray,* 618 F.2d 892, 896 (2d Cir.1980). These considerations determine, in large part, whether violation of distinct statutory provisions may be charged in a single indictment count— that is, whether an indictment count is impermissibly duplicitous. As the Second Circuit Court of Appeals explained in *Murray,* "If the doctrine of duplicity is to be more than an exercise in mere formalism, it must be invoked only when an indictment affects the policy considerations discussed above; because those policy considerations are not thwarted here, we conclude that the indictment was not duplicitous...." 618 F.2d at 897–98. Accordingly, courts have held that a single indictment count charging violations of the "offense" and "defraud" clauses—if framed with adequate specificity—would enable determination of the "convicted" offenses and thus would not be impermissibly duplicitous.[24]

The double jeopardy inquiry, by contrast, focuses not on the clarity of the jury verdict but rather on whether a later prosecution entails the double punishment prohibited by the Constitution. The overriding issue is not whether a specific indictment count speaks with the requisite lucidity, enabling precise determination of the jury's findings, but rather whether Congress intended to impose multiple punishment for violation of distinct statutory provisions. And, here, considering the obvious difference between the two types of conspiracies alleged and their im-

---

23. The majority fails to discuss *Ervasti* and *Thompson* and merely cites these cases in a string citation as contrary authority.

24. *See United States v. Williams,* 705 F.2d 603, 624 (2d Cir.1983) ("The specificity of the conspiracy-to-defraud allegations and the jury's verdicts on the substantive counts eliminate any possibility of the concerns expressed in *United States v. Rosenblatt,* 554 F.2d 36, 40–42 (2d Cir.1977), on which appellants rely, that a count alleging only a conspiracy to defraud the United States in some unspecified way risks conviction without either an allegation or proof of the essential nature of the fraud.").

plications for purposes of sentence, surely it did not. These fundamentally distinct inquiries preclude rote application of duplicity precedents to the double jeopardy context. Accordingly, no federal court of appeals has relied on its duplicity precedents to determine whether the "offense" and "defraud" clauses define distinct offenses for purposes of double jeopardy.[25] And, in fact, at least one court of appeals has construed § 371 *differently* in the double jeopardy than in the duplicity context. *Compare Thompson*, 814 F.2d at 1476–77 (double jeopardy), with *United States v. Hauck*, 980 F.2d 611, 615 (10th Cir.1992) (duplicity).[26]

Equally concerning is the majority's rejection of *Blockburger* as the controlling test for double jeopardy in the situation before us. The majority relies on *United States v. Liotard*, 817 F.2d 1074 (3d Cir. 1987), as setting forth the applicable test for defendants' double jeopardy claim. However, the Supreme Court has repeatedly and consistently held that where distinct conspiracy provisions are implicated, the *Blockburger* test governs whether separate prosecution of each violation offends the Double Jeopardy Clause. *See*

*Albernaz*, 450 U.S. at 339–42, 101 S.Ct. 1137; *American Tobacco Co. v. United States*, 328 U.S. 781, 788, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). *Liotard* applies where there are successive prosecutions for the *same* offense. The central inquiry under *Liotard* is whether the particular agreements into which defendants entered were part of a single overarching conspiracy. But that consideration is relevant only if two criminal conspiracies involving the same offense are charged. That is not what is before us. Here, *Blockburger* not only applies; more than that, the result reached via the *Blockburger* analysis proves the point: the elements are different and separate punishments were therefore intended and double jeopardy does not apply.

Because *Blockburger* focuses on the elements of the provisions violated—not the factual details of the agreements into which defendants entered—it applies, even where the particular violations emanate from a single overarching agreement, (as the majority, applying the *Liotard* factors, concluded was the case here.)[27] On this point, *Albernaz* is instructive. There, the

**25.** In *Smith (David L.)*, the court held that § 371 does not create distinct statutory offenses; it did so, however, without reference to, and independent of, case law reaching the same conclusion in the duplicity context. 424 F.3d at 1000.

**26.** *See also United States v. Dale*, 782 F.Supp. 615, 619 (D.D.C.1991) (distinguishing courts' construction of § 371 in the duplicity and double jeopardy contexts and rejecting application of double jeopardy cases to the duplicity inquiry).

**27.** *See United States v. Marren*, 890 F.2d 924, 936 (7th Cir.1989) ("In general, an agreement to commit several unlawful acts must be charged as a single conspiracy. An exception, however, exists where Congress has manifested an intent to authorize multiple punishments for conduct that violates *two statutory provisions*.") (internal citation omit-

ted) (emphasis added); *United States v. Phillips*, 664 F.2d 971, 1007 (5th Cir.1981) ("[U]nder the *Blockburger* test it is possible for a single criminal agreement or conspiracy to give rise to distinct offenses under specific, separate conspiracy statutes."); *United States v. Barton*, 647 F.2d 224, 235 (2d Cir.1981) ("It is undisputed that a single transaction may give rise to liability for distinct offenses under separate statutes without violating the Double Jeopardy Clause. This is true whether the offenses be substantive crimes ... or *crimes of conspiracy*.") (emphasis added); *see also United States v. Morris*, 99 F.3d 476 (1st Cir.1996) (applying *Blockburger* test to determine whether Double Jeopardy Clause prohibited prosecution under two distinct conspiracy provisions, 18 U.S.C. § 371 and 21 U.S.C. §§ 841(a)(1) & 846).

Supreme Court held that, notwithstanding a single narcotics conspiracy or agreement, because distinct offenses of conspiracy to import marijuana, 21 U.S.C. § 963, and conspiracy to distribute marijuana, 21 U.S.C. § 846, were separately charged, there is no double jeopardy violation. *Albernaz*, 450 U.S. at 340, 101 S.Ct. 1137. Because Congress intended to authorize consecutive sentences for violation of the two distinct offenses, the Court concluded that imposition of cumulative punishment was permissible, even where only a single overarching agreement or conspiracy existed. *Albernaz* applied *Blockburger* as the established methodology for adjudicating double jeopardy claims brought by conspiracy defendants. In *American Tobacco Co.*, decided almost four decades before *Albernaz*, the Supreme Court, again applying *Blockburger*, approved the imposition of separate penalties for defendants convicted of conspiring to restrain trade in the tobacco industry in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and of conspiring to monopolize the tobacco industry in violation of section 2 of that Act, 15 U.S.C. § 2 (1976). 328 U.S. at 788, 66 S.Ct. 1125. The Court rejected a double jeopardy argument similar to that pressed by defendants here:

> On the authority of the *Braverman* case, petitioners claim that there is *but one conspiracy*, namely, a conspiracy to fix prices. In contrast to the single conspiracy described in that case in separate counts, *all charged under the general conspiracy statute*, we have here *separate statutory offenses*, one a con-

spiracy in restraint of trade that may stop short of monopoly, and the other a conspiracy to monopolize that may not be content with restraint short of monopoly. One is made criminal by § 1 and the other by § 2 of the Sherman Act.

> We believe also that in accordance with the *Blockburger* case, §§ 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap.

*Id.* at 788, 66 S.Ct. 1125 (citations omitted) (emphasis added). Because the *Blockburger* test, which focuses on the *elements* of the offenses, controls here, the majority's application of *Liotard*'s multi-factor inquiry, examining whether the particular agreements into which defendants entered constituted a single overarching conspiracy, is misplaced and unnecessary. The distinctiveness of the offenses under *Blockburger*, not the existence of an overarching agreement under *Liotard*, is what matters here for purposes of double jeopardy.

Under *Blockburger*, the imposition of cumulative punishment is permissible for violation of distinct statutory provisions, provided that each provision requires a unique element of proof. Consistent with the position adopted by virtually all courts of appeals,[28] we conclude that this requirement is easily satisfied here; the majority does not opine otherwise.[29] Accordingly,

---

28. *See Ervasti*, 201 F.3d 1029; *United States v. Morris*, 99 F.3d 476 (1st Cir.1996); *Marren*, 890 F.2d 924; *United States v. Thompson*, 814 F.2d 1472 (3d Cir.1987); *United States v. Nakashian*, 820 F.2d 549, 552–54 (2d Cir.1987); *United States v. Twomey*, 806 F.2d 1136, 1143 (1st Cir.1986).

29. The "offense" clause of § 371 requires proof: (1) of an agreement to commit an offense proscribed by federal law; (2) that the defendant was a party to the agreement; (3) that the defendant intentionally joined the agreement with an awareness of its unlawful objectives; and (4) that one of the conspirators committed an overt act in furtherance of the conspiracy. *See* Third Circuit Mod.Crim.

successive prosecutions of the Rigases under the "offense" and "defraud" clauses of § 371 do not violate the Double Jeopardy Clause.

I submit that the majority's reasoning and result is not consistent with established double jeopardy jurisprudence and will bar prosecutions that Congress did not intend to prohibit. I therefore respectfully dissent

Jury Instr. 6.18.371A (2008). The "defraud" clause of § 371 requires proof: (1) of an agreement among two or more persons to defraud the United States; (2) that the defendant was a party to the agreement; (3) that the defendant intentionally joined the agreement aware of its objective to defraud the United States; and (4) that one of the conspirators committed an overt act in furtherance of the conspiracy. *See* Third Circuit Mod.Crim. Jury Instr. 6.18.371B (2008). The Model Jury Instructions define "defraud" as to "cheat the United States government or any of its agencies out of money or property" or to "obstruct or interfere with one of the United States government's lawful functions, by deceit, craft, trickery, or dishonest means." *Id.*